## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIANA ARMSTRONG | : | CIV. NO. 3:02CV2264 (AVC) |
| *Plaintiff*, | | |
| | : | |
| v. | : | |
| | | |
| STATE OF CONNECTICUT, | | |
| DEPARTMENT OF SOCIAL SERVICES, | | |
| ET AL., | : | AUGUST 5, 2004 |
| *Defendants*. | | |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The plaintiff in this civil action is a former employee of the State of Connecticut, Department of Social Services (hereinafter "DSS"), and was employed as a Social Services Trainee (hereinafter "SST"). She alleges, inter alia, that the actions of the defendant(s), DSS, Silvana Flattery, Michele Farieri, Rudolph Jones, and Carol Scherer, constituted discrimination based on race when DSS classified her as an SST, instead of a Connecticut Careers Trainee (hereinafter "CCT"), upon her employment with the agency. She also claims that DSS terminated her employment in retaliation for complaining about their classification of her as an SST instead of a CCT.

The plaintiff's complaint contains four counts. In the First Count, she alleges a violation of 42 U.S.C. § 1983 by the defendants, Silvana Flattery, Michele Farieri, Carol Scherer, and Rudolph Jones. The Second Count of her complaint alleges a violation of the Connecticut Fair Employment Practices Act (hereinafter "CFEPA") by the defendant DSS. The Third Count alleges a violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000, et. seq. (hereinafter "Title

1

VII"), by the defendant DSS. The Fourth Count of the plaintiff's complaint alleges a violation of the CFEPA (disability discrimination), by the defendant DSS.

The defendant(s) have moved the Court for Summary Judgment in their favor on all counts for the following reasons:

1.    Counts 2, 3, and 4 seeking compensatory damages directly against the State of Connecticut, or its officials under Conn. Gen. Stat. §46(a)-60(a)(1), et. seq., are barred by the Eleventh Amendment and Sovereign Immunity.

2.    The plaintiff's § 1983 claim against Silvana Flattery, Michele Farieri, Rudolph Jones, and Carol Scherer (individually) fail to state a claim upon which relief can be granted.

3.    The plaintiff's § 1983 claim against Silvana Flattery, Michele Farieri, Rudolph Jones, and Carol Scherer (official capacity) fail to state a claim upon which relief can be granted.

4.    The defendant(s), Silvana Flattery, Michele Farieri, Rudolph Jones, and Carol Scherer, are entitled to qualified immunity from damages caused under § 1983.

5.    The defendant(s), Silvana Flattery, Michele Farieri, Rudolph Jones, and Carol Scherer are entitled to sovereign immunity from damage claims under § 1983.

6.    The plaintiff cannot show a violation of her equal protection rights under 42 U.S.C. § 1983 on account of her race.

7.    The plaintiff cannot prove a case of retaliation under Title VII.

2

8.        The plaintiff cannot prove, under Title VII, that race was a motivating factor when DSS, upon employing her, hired her as an SST, instead of a CCT.

9.        The plaintiff cannot establish that the Defendants' actions were a pretext for discrimination.

10.       The Court should decline to exercise pendant jurisdiction over the plaintiff's state law claim.

## I.  FACTUAL BACKGROUND

The detailed facts of this case are set forth fully in the Defendants' Rule 56(a) Statement.  Therefore, for the purposes of this Memorandum, the defendant(s) will simply highlight salient facts as an overview.  At all relevant times to this matter, the plaintiff held the position of Social Services Trainee ("SST") for the Department of Social Services ("DSS") and was employed by DSS from August 17, 2001 until her termination on November 5, 2001.  (**Exh. 15**, letter dated August 13, 2001, from Lisa Owens to Armstrong, **Exh. 1,** Excerpts from Deposition of Tiana Armstrong dated June 14, 2004, p. 10:21-25); (**Exh. 25**, letter dated November 5, 2001 from Lisa Owens to plaintiff); (**Exh. 1**, Armstrong Deposition, p. 11:11-12; 12:17-20).  The plaintiff, at the time of her dismissal from state service, was an at will employee because she was in her working test period.  (**Exh. 6,** Deposition of Rudolph Jones, pp. 9:11-20; 10:13-15); (**Exh. 4,** Michele Farieri Deposition, pp. 19:23 -  ; 20:2).

The DSS posted a Revised Vacancy Notice for Eligibility Services Workers within the North Central Region.  The notice included the wording "The position(s) may

be underfilled at the Social Services Trainee or Connecticut Careers Trainee level" with a closing date of June 6, 2001.  (**Exh. 14**, DSS Revised Vacancy Notice, posting date May 22, 2001).

The job posting for Eligibility Services Worker specifically states "the positions will be filled by candidates who are eligible for appointment as an Eligibility Services Worker, SST or CCT, or the positions may be filled by existing lists which we are obliged to use."  (**Exh. 14**, DSS Revised Vacancy Notice, posting date May 22, 2001).

DSS's practice is to state to the candidates, the targeted classification level of Eligibility Services Worker.  It is not their normal practice to clarify during the interview process, whether the candidates are being interviewed at SST or CCT level.  (**Exh. 2,** Owens Deposition, p. 9:8-19).

The plaintiff was informed to report to the Central Office, Human Resources Division on August 24, 2001 for orientation.  (**Exh. 15**).

The plaintiff attended the personnel orientation session on August 24, 2001.  At the orientation session, she was given a packet of handouts, including Department of Social Services' Time and Attendance Policy.  (**Exh. 16**, Performance Appraisal Narrative, p. 2).

The plaintiff contacted Lily "Cookie" Marshall, to inquire why she was hired as an SST, rather than as a CCT. (**Exh. 5**, Excerpts from Marshall Deposition, dated June 8, 2004, pp. 5:15-22; p. 7:4-20; p. 9:4-15).

Marshall informed the plaintiff that there was an individual on the SEBAC List at the CCT level and that she could not be hired as a CCT until the individual on the

4

SEBAC List was hired by some agency at that level.  (**Exh. 5**, Marshall Deposition,  pp. 10:2-11:17, pp. 15:20-16:6, p. 35:3-7; **Exh. 17** Article 13, Section 5 of the P-2 Contract).

The SEBAC List is a list of candidates who have been laid off from either a current agency or other agency.  (**Exh. 5**, Marshall Deposition, p. 34:14-16).

An individual on the SEBAC List who has the proper credentials must be hired and someone from the outside cannot be considered for the position.  (**Exh. 2,** Owens Deposition, p. 13:13-17; **Exh.1 18**, Permanent Appointments, Section 5-228-1 of the Regulations of Connecticut State Agencies).

DSS could not hire the plaintiff in the CCT position/classification until the individual on the SEBAC List was hired.  (**Exh. 5**, Marshall Deposition, p. 16:18-19; pp. 40:19-41:1).

The plaintiff was offered, and she accepted the SST position.  (**Exh. 2**, Owens Deposition, p. 16:1-11).

Shortly thereafter, the plaintiff began her pattern of absences.  On August 31, 2001, the plaintiff left a voice mail message for her supervisor, in which she indicated that she would not be at work that day because of the flu.  (**Exh. 1,** Excerpts from Deposition of Tiana Armstrong, pp. 59:1-5; 60:13; 61:10).

On September 6, 2001, the plaintiff called her supervisor and informed her that she thought she had food poisoning and would be out sick.  She did not report to work that day.  (**Exh. 1**, Armstrong Deposition, pp. 61:11-62-3).

On September 7, 2001, Ms. Armstrong used 1.5 hours of leave without pay for a doctor's appointment.  She said the reason she was out was because of food poisoning.  (**Exh. 1,** Armstrong Deposition, pp. 62:4-64:23).

On September 17, 2001, the plaintiff was again absent.  (**Exh. 1**, Armstrong Deposition 66:4-11; 66:20-25; 67:1-2; 67:7-25; 68:1-4; 68:7-21).  She agrees that she was absent for more than one day.  (**Exh. 1**, Armstrong Deposition, p. 82:21-25; 83:1-23; 92:3-8).

On September 26, 2001, the plaintiff was scheduled for CORE Training.  She called in that day at 7:15 a.m. and said she had a doctor's appointment and would be in at 8:30 a.m.  (**Exh. 1,** Armstrong Deposition, p. 69:1-23).

The plaintiff did not give advance notice to her supervisor regarding her doctor's appointment on September 26, 2001.  She reported to work that day at 1:00 p.m.  (**Exh. 1**, Armstrong Deposition, pp. 69:24 - 70:3).

As a result of the plaintiff's absences to this point, the plaintiff had to attend an informal counseling session.  On October 5, 2001, an informal counseling session was held due to the plaintiff's occasions of absence(s) from work.  It was held pursuant to the agency's time and attendance policy.  (**Exh. 4**, Excerpt from Farieri Deposition, dated June 9, 2004,  p. 13:1-12).

The plaintiff received a letter of informal counseling for attendance issues on October 5, 2001 from her supervisor, Carol Scherer, that was also attended by Operations Manager, Michele Farieri.  (**Exh. 19**, Informal Counseling Memo to Armstrong, dated October 5, 2001; **Exh. 4,** Excerpts from Farieri Deposition,  p. 11:13-25, 14:8-13).

At the informal counseling session of October 5, 2001, the plaintiff was given a copy of the DSS's Attendance and Tardiness Guidelines.  (**Exh. 20**, DSS Guidelines for Employee Attendance and Tardiness Revised March, 1998; **Exh. 4**, Farieri Deposition, p. 38:4-15).

The plaintiff was given a copy of the brochure the Employee Assistance Program (hereinafter "EAP") at the October 5, 2001 informal counseling session.  (**Exh. 22**, EAP Brochure; **Exh. 4**, Farieri Deposition, p. 38:4-15).

The plaintiff was warned at the informal counseling session on October 5, 2001, that "any additional occasions of absence may result in administrative action up to and including dismissal."  (**Exh. 19**, Informal Counseling Memo dated October 5, 2001; **Exh. 3**, Scherer Deposition, p. 53:1-8).

The plaintiff informed her supervisor, Carol Scherer, and Michele Farieri, at the October 5, 2001 informal counseling session that she understood the policies, her responsibilities and said that it would not happen again.  (**Exh. 23**, Notes of Michele Farieri dated October 5, 2001).

The plaintiff did not mention to either Carol Scherer or Michele Farieri that at the October 5, 2001 informal counseling session, that she suffered from migraine headaches.  (**Exh. 3**, Scherer Deposition, pp. 19:2-20:11).  In fact, the plaintiff did not indicate on her PER-301 Form that she suffered from migraines nor did she check off in the space provided on the form that she had a disability.  (**Exh. 1**, Deposition of Tiana Armstrong, pp. 28:15-29:9; **Exh. 38**, PER-301 Form submitted by Armstrong).

There was no discussion at the informal counseling meeting on October 5, 2001 about the plaintiff getting a doctor's note to substantiate her absences.  (**Exh. 3**, Scherer Deposition, pp. 25:18-26:2).

On October 5, 2001, when the plaintiff had reached her fifth occasion of absence, and during/after her informal counseling session to address her numerous occasions of absences, the plaintiff at the end of the aforementioned session, met with Farieri to

address the issue of why she was hired as an SST rather than a CCT.  Farieri does not recall the plaintiff mentioning that she suffered from migraines.  (**Exh. 3**, Scherer Deposition, p. 20:9-21; **Exh. 4**, Farieri Deposition, p. 15:11-20, p. 18:12-14; **Exh. 23**, Handwritten notes of Michele Farieri for October 5, 2001).

On October 18, 2001, the plaintiff was called into a second session by her supervisor, Carol Scherer.  (**Exh. 3**, Scherer Deposition, pp. 61:24 - 62:13; **Exh. 17**, pages 38 and 39 of the Collective Bargaining Agreement, effective July 1, 1999 to June 30, 2002).

The plaintiff requested to meet with Michele Farieri on October 18, 2001.  However, she did not mention to Ms. Farieri at this meeting, that she suffered from migraines.  (**Exh. 4**, Farieri Deposition, p. 24:17-21;  p. 26:13-15; p. 26:19-22).

On October 25, 2001, the plaintiff's sixth occasion of absence, the plaintiff did not report to work.  She called her supervisor in the morning and told her she would be out due to a migraine.  (**Exh. 16**, Performance Appraisal Narrative, p. 3).

Ms. Armstrong informed her supervisor, Carol Scherer, that she suffered from migraine headaches on October 25, 2001.  This was the first time that her supervisor heard about the plaintiff suffering from migraines.  (**Exh. 3,** Scherer Deposition dated June 8, 2004, p. 12:12-25; p. 13:1-4; p. 53:14-17; **Exh. 2**, Owens Deposition, p. 64:11-17).

Lisa Owens, Personnel Officer for the North Central Region of DSS, recommended to Rudolph Jones, Director of Human Resources, that the plaintiff be dropped during her working test period.  (**Exh. 24**, Memo dated October 29, 2001 from Owens to Jones).

The plaintiff was separated from state service by DSS for failure to complete her initial probationary period. (**Exh. 25**, Letter dated November 5, 2001 from Lisa Owens to the plaintiff; **Exh. 1**, Armstrong Deposition, p. 11:11-12; 12:17-20).

Subsequent to the plaintiff being dropped from her working test period, she was given a SPERL Hearing.

An employee who is separated from state service during their working test period does not have union rights under the Collective Bargaining Agreement. They may request a union representative to accompany them to a SPERL Hearing regarding the dismissal.

A SPERL Hearing satisfies an employee's statutory right to present grievances to the employer. DSS conducted a SPERL Hearing for the plaintiff after she was dropped from state service. (**Exh. 32**, Employee's Statutory Right to File Grievance; **Exh. 5**, Marshall Deposition, p. 39:6-13).

## II.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment is granted when there is no genuine issue or dispute as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Larkin v. Town of West Hartford, 891 F.Supp. 719, 723 (D.Conn. 1995). A dispute over a material fact exists if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate the absence of any material fact genuinely in dispute. American Int'l Group Inc. v. London American Int'l Corp., 664 F.2d 348, 351

(2d Cir. 1981). However, "summary judgment must be entered against 'a party who fails

... to establish the existence of an element essential to [its] case, and on which it will bear

the burden of proof at trial,'" <u>Larkin</u>, 891 F.Supp. at 723 quoting <u>Celotex</u>, 477 U.S. at

322.

> This court has held:
>
> > In deciding whether there is a genuine issue of material fact, the court
> > must draw all reasonable inferences in favor of the non-moving party.
> > <u>Anderson v. Liberty</u> <u>Lobby, Inc</u>., 477 U.S. 242, 255, 106 S.Ct. 2502, 2513,
> > 91 L.Ed.2d 202 (1986). Not every factual dispute will defeat a motion for
> > summary judgment; a factual issue must be both "genuine" and
> > "material". <u>Id</u>. at 247-48, 106 S.Ct. at 2509-10 (emphasis omitted). A
> > factual issue is not "genuine" unless "the evidence is such that a
> > reasonable jury could return a verdict for the non-moving party." <u>Id</u>. at
> > 248, 106 S.Ct. at 2510. A factual issue is not "material" unless "it might
> > affect the outcome of the suit under the governing law." <u>Id</u>.
>
> <u>Larkin</u>, 891 F.Supp. at 723-24.

Rule 56(c) "provides that the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson

v. Liberty</u>, 477 U.S. at 247-48. Generally speaking, summary judgment is inappropriate

where an individual's intent or state of mind are at issue. <u>Patrick v. LeFevre</u>, 745 F.2d

153, 159 (2d Cir. 1984). Summary judgment is available to defendants in discrimination

cases. As the Second Circuit held in <u>Meiri v. Dacon</u>, 759 F.2d 989 (2d Cir.) <u>cert</u>. <u>denied</u>,

474 U.S. 829 (1985), in granting summary judgment for the defendants.

> In so concluding, we are of course mindful that summary judgment is
> ordinarily inappropriate where an individual's intent and state of mind are
> implicated. The summary judgment rule would be rendered sterile,
> however, if the mere incantation of intent or state of mind would operate
> as a talisman to defeat an otherwise valid motion. Indeed, the salutary
> purposes of summary judgment - avoiding protracted, expensive and

harassing trials - apply no less to discrimination cases than to commercial or other areas of litigation.

Id. at 998 (citations omitted); accord Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 40 (2d Cir. 1994).

To defeat the motion, the nonmoving party must show more than that "some metaphysical doubt as to the material facts." Matsushita v. Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). "A party may not 'rely on mere speculation or conjecture as to the true nature of facts to overcome a motion for summary judgment.'" McCloskey v. Union Carbide Corp., 815 F.Supp. 78, 81 (D.Conn. 1993) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12, (2d Cir. 1986) cert. denied, 480 U.S. 932 (1987). The "party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial for in doing so he risks the possibility that there will be no trial ... To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars would necessitate a trial in all Title VII cases." Meiri v. Dacon, 759 F.2d at 998.

"[S]ummary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial." Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir. 1987). Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered when a review of the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995).

Once that burden is met, the opposing party may not rely upon mere allegations or denials in his pleading, but rather must set forth specific facts showing that there is a genuine issue remaining for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("[e]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment").  ***"If the [plaintiff's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."***  Anderson, 477 U.S. at 249-250 (citations omitted) (emphasis added).  As the Supreme Court has made clear, the Court must evaluate the Defendants' motion for summary judgment according to the plaintiff's ultimate burden of proof.  Anderson, 477 U.S. at 252; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The fact that this case is an employment discrimination case does not alter the application of these rules.  Although questions concerning the employer's intent may arise in such cases, the Second Circuit has emphasized that "the summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.  Indeed, the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829 (1985); Johnson v. Air Tower Air, Inc., 149 F.R.D. 461, 466 (E.D.N.Y. 1993).

        In the present case, the plaintiff's total lack of evidence to support the essential elements of her claim compels the conclusion that no reasonable jury could render a verdict in her favor.  As the Second Circuit stated in another employment discrimination

case, "**some** evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the employee's age [or national origin] was the real reason for the discharge."  Woroski v. Nashua Corporation, 31 F.3d 105, 109-110 (2d Cir. 1994) (emphasis in original).  In the absence of such evidence, summary judgment for the defendant is not only appropriate, but warranted in order to prevent the parties and this Court from "becoming entrenched in a frivolous and costly trial."  See Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir. 1987); Raskin v. Wyatt, 125 F.3d 55, 65 (2d Cir. 1997).

### A.    THE PLAINTIFF CANNOT SHOW A VIOLATION OF HER EQUAL PROTECTION RIGHTS UNDER 42 U.S.C. § 1983.

In *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980), the United States Court of Appeals for the Second Circuit concluded that, to properly plead a selective treatment equal protection cause of action, a plaintiff must show that:

> (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith.

Id. At 609.  S*ee*, e.g. *Giordano v. City of New York*, 274 F.3d 740, 750-51 (2d Cir. 2001);

*Trieste Rest. V. Village of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999); *Crowley v. Courville*,

76 F.3d 47, 52-53 (2d Cir. 1996); *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995).

The Second Circuit has been "careful to apply each prong of the test separately, finding the

failure to satisfy either inquiry fatal to the plaintiff's claim." A.*B.C. Home Furnishings, Inc. v. Town of East Hampton*, 964 F. Supp. 697, 702 (E.D.N.Y. 1997); *Latrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999). *Wallett v. Anderson and Delaney*, Civil Action No. 3:00CV0053 (AVC), Ruling on Motion For Summary Judgment, decided August 1, 2002.

**1.      Plaintiff Cannot Prove Selective Treatment**.

       To satisfy the first prong of a selective treatment equal protection cause of action, a plaintiff must offer evidence that "he was similarly situated to other persons but was nevertheless treated differently,"  *A.B.C. Home Furnishings,* 964 F. Supp. At 702 (citing *Gagliardi v. Village of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994); *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 61 (2d Cir. 1985).  "To be similarly situated, the individuals with whom the litigant attempts to compare [himself] must be similarly situated in all material respects" and have "engaged in comparable conduct."  *Shumway v. United Parcel Service, Inc.* 118 F. 3d 60, 64 (2d Cir. 1997).[1]  See also, Yajure v. DiMarzo, 130 F. Supp. 2d 568, 572 (S.D.N.Y. 2001)(noting "[t]he test for determining whether persons similarly situated were selectively treated is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent..")

       Applying these principles, Armstrong has failed to raise a genuine issue of material fact as to the first prong of her selective treatment cause of action, i.e. that "the person, compared with others similarly situated, was selectively treated." *Le Clair v.*

---

[1] Shumway discusses the standard for "similarly situated" in the context of Title VII. However, the Second Circuit applies the same Shumway "similarly situated" standard in the context of selective treatment equal protection cases.  *See e.g. LaTrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999); *Hart v. Westchester City Dept. of Social Services,* 160 F. Supp. 2d 570, 578 (S.D.N.Y. 2001)

*Saunders,* 627 F.2d 606, 609 (2d Cir. 1980). She does not offer evidence that "other similarly situated employees" were "similarly situated in all material respects." *Shumway v. United Parcel Service, Inc*. 118 F.3d 60, 64 (2d Cir. 1997). She has offered no evidence that other similarly situated individuals with allegations of "comparable conduct" against them received different treatment. *See, Shumway a. United Parcel Service* at 64. As the Second Circuit concluded in *Gagliardi v. Village of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994), "bald allegations" are not sufficient to raise a genuine issue of material fact that defendants treated similarly situated individuals differently. *See also Shumway*, 118 F.3d at 65.

To prevail on her equal protection claim, the "plaintiff must show that she was treated differently because of her ethnicity, national origin race, or her membership in another suspect class." See *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 143-44 (2d Cir. 1993); *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir. 1989). The requirement of discriminatory intent or purpose "…implies that the decision maker, … selected or reaffirmed a particular course of action at least in part 'because', not merely 'in spite of' its adverse effects … upon a member of a protected group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

The applicable law makes clear that the plaintiff's equal protection claims are without merit. First, plaintiff cannot prove that compared with others similarly situated, she was selectively treated.

Plaintiff has alleged that the defendants, Silvana Flattery, Michele Farieri, Carol Scherer, and Rudolph Jones, selectively treated her differently than other similarly

situated employees for no rational reason, and based on her race when DSS hired her as an SST instead of a CCT, and when they terminated her employment thereby violating her right to equal protection of the laws, as guaranteed in the Federal Constitution. (Complaint, ¶ 15).

The plaintiff claims that she was hired as an SST instead of a CCT, based on her race and was "selectively" treated differently than other similarly situated employees when DSS both hired and terminated her, lacks merit.  When the plaintiff contacted Lily "Cookie" Marshall to inquire why she was hired as an SST instead of a CCT, she was informed that there was an individual on the SEBAC list at the CCT level, and that she could not be hired as a CCT, until the individual on the SEBAC list was hired by some agency at that level.  (**Exh. 5**, Marshall Deposition, pp. 5:15-22; p. 7:4-20; p. 9:4-15; p. 10:2-12:17, pp. 15:20-16:6, p. 35:3-7; **Exh. 17**, Article 13, Section 5 of the P-2 Contract).

The SEBAC list is a list of candidates who have been laid off from either a current agency or other agency.  Additionally, an individual on the SEBAC list who has the proper credentials MUST be hired and someone from the outside cannot be considered for the position.  (**Exh. 5,** Marshall Deposition, p. 34:14-16, **Exh. 2**, Owens Deposition, p. 13:13-17, **Exh. 18,** Permanent Appointments, Section 5-228-1 of the Regulations of Connecticut State Agencies).

The Defendants' rational basis in hiring the plaintiff as an SST instead of a CCT was as a result of the individual who was on the SEBAC list, and they could not have the plaintiff in the CCT position/classification, until the individual on the SEBAC list was hired.  (**Exh. 5**, Marshall Deposition, p. 16:18-19; pp. 40:19-4:1).  DSS, in hiring off the SEBAC list, exercised its right to underfill the position by not taking the individual off of

the SEBAC list.  (**Exh. 2**, Owens Deposition, p. 14:5-15).  DSS was within their right to

do so, and there was nothing procedurally incorrect when they elected to offer the

position to the plaintiff, to which she accepted .  (**Exh. 2**, Owens Deposition, p. 14:19-

25).  (**Exh. 2,** Owens Deposition, p. 16:1-11).  Neither Carol Scherer (plaintiff's

supervisor), Rudolph Jones, Silvana Flattery, or Michele Farieri had any input or

involvement in the plaintiff being hired as an SST, instead of a CCT.  (**Exh. 9**, Affidavit

of Carol Scherer, ¶'s 6-15, **Exh. 12**, Affidavit of Rudolph Jones, ¶ 20-24; **Exh. 13,**

Affidavit of Silvana Flattery, ¶ 5, 10, 15; **Exh. 7**, Excerpts of Flattery Deposition, pp.

8:24-9:20).

      The plaintiff's hiring by DSS as an SST had absolutely nothing to do with her

race.  She was not hired as an SST because she is an African-American; she was hired as

an SST because there existed an individual on the SEBAC list at the CCT level and she

could not be hired as a CCT until the individual on the SEBAC list was hired by some

agency at that level.  (**Exh. 5**, Marshall Deposition, pp. 10:2-11:17, pp. 15:20-16:6, p.

35:3-7; **Exh. 17,** Article 13, Section 5 of the P-2 Contract, **Exh. 18**, Permanent

Appointments, Section 5-228-1, Regulations of Connecticut State Agencies).  (**Exh. 5**,

Marshall Deposition, p. 16:18-19; pp. 40:19-41:1).


**2.**     **Plaintiff Cannot Prove Discriminatory Intent On The Part Of The Defendants.**

      Even if Armstrong was able to satisfy the first prong of the selective treatment

cause of action, she cannot satisfy the second prong and its requirement to prove the

defendants' actions were "intentionally motivated" to deprive the plaintiff of her

"constitutional rights or to maliciously injure her."  See, *LeClair v. Saunders*, 627 F.2d

606, 609-10 (2d Cir., 1980).  Armstrong cannot prove any discriminatory intent let alone the even higher standard of malice.

The facts show the absence of intentional discrimination on the part of DSS and Rudolph Jones in the decision to terminate Armstrong based on her excessive absenteeism.  The plaintiff began her employment with DSS on August 17, 2001, but by August 31, 2001, the plaintiff's pattern of absences began.  (**Exh. 1**, Excerpts from Armstrong Deposition, p. 10:21-25).  The plaintiff was an at-will employee at the time of her dismissal from state service because she was in her working test period.  (**Exh. 6**, Deposition of Rudolph Jones, pp. 9:11-20; 10:13-15).  (**Exh. 4**, Michele Farieri Deposition, pp. 19:23-20:2).

On August 31, 2001, the plaintiff left a voice mail message for her supervisor, in which she indicated that she would not be at work that day because of the flu.  (**Exh. 1**, Excerpts from Deposition of Tiana Armstrong, pp. 59:1-5; 60:13; 61:10).  On September 6, 2001, the plaintiff again was absent, informing her supervisor that she thought she had food poisoning and would be out sick.  (**Exh. 1**, Armstrong Deposition, pp. 61:11- 62-3).  On September 7, 2001, Ms. Armstrong used 1.5 hours of leave without pay for a doctor's appointment in which she indicated the reason as being food poisoning.  (**Exh. 1**, Armstrong Deposition, pp. 62:4-64:23).  On September 17, 2001, the plaintiff was again absent.  (**Exh. 1**, Armstrong Deposition, p. 82:21-25; 83:1-23; 92:3-8).

On September 26, 2001, the plaintiff was scheduled for her CORE Training.  However, she called in that day at 7:15 a.m. and indicated she had a doctor's appointment and would be in at 8:30 a.m.  But, she did not give advanced notice to her supervisor regarding her doctor's appointment on September 26, 2001.  She reported to work that

day at 1:00 p.m.  (**Exh. 1**, Armstrong Deposition, p. 69:1-23; **Exh. 1**, Armstrong Deposition, pp. 69:24-70:3).

      As a result of the plaintiff's absences to this point, she was requested to attend an informal counseling session.  On October 5, 2001, an informal counseling session was held due to the plaintiff's  occasions of absences from work.  The informal counseling session was held pursuant to the agency's time and attendance policy; a copy of which the plaintiff had received upon her employment with DSS.  (**Exh. 16**, Performance Appraisal Narrative, p. 2; **Exh. 20**, **Exh. 4**, Farieri Deposition, p. 13:1-12).  She received a letter of Informal Counseling for her attendance issued on October 5, 2001.  Present at the informal counseling session was Carol Scherer (plaintiff's supervisor), and Michele Farieri, Operations Manager.  (**Exh. 19,** Informal Counseling Memo to Armstrong dated October 5, 2001; **Exh. 4**, Excerpts from Farieri Deposition, p. 11:13-25, 14:8-13).  At the informal counseling session of October 5, 2001, the plaintiff was given a copy of DSS's Attendance and Tardiness Guidelines, as well as a copy of the brochure of the Employee Assistance Program (hereinafter "EAP").  (**Exh. 20**, **Exh. 4**, Farieri Deposition, p. 38:4-15, **Exh. 22**, EAP Brochure; **Exh. 4**, Farieri Deposition).  Additionally, the plaintiff was warned at the informal counseling session, that "any additional occasions of absence may result in administrative action up to and including dismissal."  She informed both Carol Scherer and Michele Farieri that she understood that she understood her responsibilities and indicated that it would not happen again.  (**Exh. 19**, Informal Counseling Memo dated October 5, 2001; **Exh. 3,** Scherer Deposition, p. 53:1-8; Notes of Michele Farieri, October 5, 2001).  The plaintiff did not mention to either Carol Scherer or Michele Farieri at the October 5, 2001 Informal Counseling Session that she suffered from

migraines, nor was there a discussion regarding the plaintiff's getting a doctor's note to substantiate her absences.  (**Exh. 3**, Scherer Deposition, pp. 19:2-20:11; 25:11-26:2).  At the end of the session, the plaintiff met with Michele Farieri to discuss her hire as an SST, rather than a CCT.  (**Exh. 3**, Deposition, p. 20:9-21; **Exh. 4**, Farieri Deposition, p. 15:11-20, p. 18:12-14; **Exh. 23**, Handwritten notes of Farieri for October 5, 2001).

Thereafter, on October 18, 2001, plaintiff was called into a second session by Carol Scherer.  (**Exh. 3,** Scherer Deposition, pp. 61:24-62:13, **Exh. 17**, pages 38 and 39).  The plaintiff requested to meet with Michele Farieri on said date; she did not, however, mention to Farieri at this meeting, that she suffered from migraines.  (**Exh. 4**, Farieri Deposition, p. 24:17-21; p. 26:13-15; p. 26:19-22).

On October 26, 2001, the plaintiff's sixth occasion of absence, she did not report to work.  She called her supervisor and told her she would be out due to a migraine. (**Exh. 16**, Performance Appraisal Narrative, p. 3).

This was the first time that her supervisor, Carol Scherer, had heard about the plaintiff suffering from migraines.  (**Exh. 3,** Scherer Deposition, p. 12:12-25; p. 13:1-4, p. 53:14-17; **Exh. 2,** Owens Deposition, p. 64:11-17).  Prior to September 26, 2001, Lisa Owens had no knowledge of plaintiff's claim that she suffered from migraines.  On September 26, 2001, the plaintiff requested a medical certificate from Owens, and indicated to Owens that she had a chronic medical condition; however, she didn't specify migraines.  Owens had no knowledge that plaintiff's absences were due to migraines. (**Exh. 2**, Owens Deposition, p. 63:307; 64:11-17; 64:23-25; 65:5-12).  Neither Carol Scherer nor Michele Farieri told Owens of a migraine problem that the plaintiff was (allegedly) dealing with.  (**Exh. 2**, Owens Deposition, p. 62:16-23).  Any of the excuses

given by the plaintiff for the earlier absences would not trigger recognition of a chronic medical condition, because all of the plaintiff's reasons for her absences varied.  (**Exh. 2**, Owens Deposition, p. 67:23 – 68:11).

Carol Scherer met with Michele Farieri to discuss the plaintiff's performance appraisal for the purpose of plaintiff's dismissal.  Performance appraisals are not necessarily given in order to notify someone that they need to improve.  (**Exh. 3**, Scherer Deposition, p. 26:3-21; p. 26:22-25; p. 27:10-14).  Dropping the plaintiff from her working test period was warranted because she had multiple absences in a working test period.  One absence is enough to terminate someone during their working test period. (**Exh. 3**, Scherer Deposition, p. 32:8-11; p. 32:21-33:2).  Scherer was not told what to say on the appraisal; she was told to be clear and concise and to state the facts.  (**Exh. 3**, Scherer Deposition, p. 34:23-35:5).  It is within the normal course of DSS's business that drafts of performance appraisals are made.  One of the corrections made on plaintiff's draft appraisal was due to grammatical errors, and Scherer had never been asked to change an appraisal in order to get someone fired.  (**Exh. 3**, Scherer Deposition, pp. 65:17-22, p. 67:9-12, p. 67:22 - 68:4).  Excessive absences can impact on one's ability to learn the new position to which they were hired.  (**Exh. 3,** Scherer Deposition, pp. 70:21 – 71:1).

The preparation of the Interim Service Rating which supported the plaintiff's termination was as a result of the plaintiff's excessive absences, not because of her race or some discriminatory intention of the aforementioned defendants.  (Defendants' 56A Statement, ¶ 5: 8, 9, 10, 11, 12, 13).  The plaintiff had reached her sixth occasion of absence when she did not report to work on October 25, 2001, despite the fact that she

previously had been formally warned at the informal counseling session on October 5, 2001 with regard to any more absences.  (**Exh. 19**, October 5, 2001 Informal Counseling Memo; **Exh. 3**, Scherer Deposition, p. 53:1-8; **Exh. 16**, Performance Appraisal Narrative, p. 3).

The plaintiff was dropped during her working test period due to attendance issues, and for failure to complete her initial probationary period; not because of race.  (**Exh. 24**, October 29, 2001 Memo from Owens to Jones); (**Exh. 25, Exh 1**, Armstrong Deposition, p. 11:11-12; 12:17-20); (**Exh. 12**, Affidavit of Rudolph Jones, ¶'s 8, 9, 10, 11, 12, 14).

DSS treated the plaintiff the same as other similarly situated employees who were dropped from their working test period.  Heather Schorr, a white female, was separated from state service (DSS) for failure to complete her working test period due to unsatisfactory work performance.  (**Exh. 26,** Letter dated August 4, 2000 from Owens to Schorr; **Exh. 31**, DSS Response to CHRO Complaint No. 0210456, dated June 28, 2002).

Elizabeth Ethier, a white female, was separated from state service (DSS) for failure to complete her Connecticut Careers Trainee working test period due to her unsatisfactory work performance.  (**Exh. 27**, Letter dated June 30, 2000 from John Malmros to Ethier; **Exh. 31**, DSS Response to CHRO Complaint No. 0210456).

Steven Dunnrowicz, a white male, was separated from state service (DSS) for unsatisfactory performance during his working test period.  (**Exh. 28**, Letter dated March 27, 2002 from Maria Taylor to Steven Dunnrowicz; **Exh. 31**, DSS Response to CHRO Complaint No. 0210456).

Richard Jennings, a white male, was separated from state service (DSS) for unsatisfactory performance during his working test period.  (**Exh. 29**, Letter dated April

11, 2002 from Melvin Jackson; **Exh. 31**, DSS Response to CHRO Complaint No.

0210456).

Holly Genovese, a white female, was separated from state service (DSS) for

unsatisfactory performance during her working test period.  (**Exh. 30**, Letter dated July

26, 2001 from Rudolph Jones to Holly Genovese; **Exh. 31**, DSS Response to CHRO

Complaint No. 0210456).

The plaintiff, therefore, has not demonstrated any issue of material fact in dispute.

The plaintiff cannot prove that Flattery, Scherer, Farieri or Jones acted intentionally,

maliciously, and wantonly.  Accordingly, plaintiff's selective treatment equal protection

claim is simply without merit.

### B.    PLAINTIFF'S CLAIMS AGAINST DEFENDANTS FLATTERY, SCHERER, FARIERI AND JONES ARE SUBJECT TO DISMISSAL ON THE GROUNDS OF QUALIFIED IMMUNITY.

If the Court finds that the plaintiff's claims are insufficient to allege violations of

§1983, the qualified immunity issue need not be reached.  However, even if the Court

should find that plaintiff's §1983 Equal Protection claims are sufficient to withstand

summary judgment, then the above defendants are entitled to the protection of qualified

immunity and summary judgment must enter in their favor.

Qualified immunity is "an entitlement not to stand trial or face the other burdens

of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2829 (1985); *Giacolone

v. Abrams*, 850 F.2d 79, 84 (2d Cir. 1988).  "The entitlement is an immunity from suit

rather than a mere defense to liability . . ." Id.  The principal purpose of the doctrine is to

enable public officials to do their jobs without fear of subsequently facing liability for

actions they could not reasonably have believed violated the law at the time. *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982), and to avoid disruption to effective

government counsel by the burdens of litigation.  *Mitchell v. Forsyth*, 105 S. Ct. at 2809.

The doctrine of qualified immunity seeks to ensure that conscientious public officials will

feel free to discharge their duties unflinchingly and without diversion, that able citizens

are not deterred from accepting public office, and that needless expense can be avoided.

*Harlow*, 102 S. Ct. at 2736.  The test is one of objective reasonableness, and is

determined by establishing whether a reasonable official in the Defendants' position

could have believed that his actions were lawful, in light of clearly established law.

*Anderson v. Creighton*, 483 U.S. 635,107 S. Ct. 3034, 3039 (1987).

The test is a stringent one and requires that there be a very close factual fit

between the case under consideration and previous case law establishing the illegality of

the action or conduct at issue in order for the law to be characterized as "clearly

established."  Thus, in determining whether a particular right was clearly established, the

Court must first identify the claimed right in a manner suited to the facts and

circumstances of the particular case.  *Anderson*, 107 S. Ct. at 3039; *Soares v. State of

Conn.*, 8 F.3d 917 (2d Cir. 1993).  Then it must examine the case law of the Supreme

Court and of the Circuit to determine whether, during the time period in question, the law

was so clearly established that a reasonable official would understand that his actions

were unlawful.  Although the precise action in question need not have been held unlawful

to defeat a claim of qualified immunity, the unlawfulness must be apparent under

preexisting law.  *Anderson*, 107 S. Ct. at 3039.

The Court must also decide whether it was clear at the time of the alleged

violations of law that an exception did not permit the actions in question.  *Gittens v.*

*LeFeure*, 891 F.2d 38, 42 (2d Cir. 1989). Finally, and perhaps most importantly, even if the court concludes that the law was clearly established, the Court must determine whether it was objectively reasonable for the official to believe that his actions did not violate those rights. *Oliveira v. Mayer*, 23 F.3d 642, 648-49 (2d Cir. 1994). The subjective motivation of the officials is irrelevant to the inquiry. *Anderson*, 107 S. Ct. at 3040; *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991). Rather, the focus is on whether reasonable officials in the position of the defendants could have believed their actions were lawful. Where reasonable officials could disagree, the official is entitled to qualified immunity. *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993).

The Second Circuit has held that where the underlying §1983 claim requires a showing of intent, as in a claim of unconstitutional retaliation, a government official's motive or intent in carrying out the questioned conduct should be considered in the qualified immunity analysis. *Musso v. Hourigan*, 836 F.2d 736, 742 (2d Cir. 1988) ("Harlow does not require us, as appellants would have it, to ignore the fact that intent is an element of the relevant cause of action." Id. at 743). See also *Sheppard v. Beerman*, 94 F.3d 823, 828-29 (2d Cir. 1996); and *Blue v. Koren*, 72 F.3d 1075, 1083 n.5. (2d Cir. 1995).

When the defense of qualified immunity is raised to a §1983 claim that is grounded in a state actor's unconstitutional motive as here, the federal district courts and Courts of Appeal have been placed in a quandary. "The 'clearly established law' and 'objective reasonableness' facets of current qualified immunity doctrine tug in opposite directions where . . . the 'clearly established law' itself contains a subjective component." *Blue v. Koren*, 72 F.3d at 1083. These courts, including the Second Circuit, recognize

that permitting consideration of motive could eviscerate the protection to which

government officials are entitled by qualified immunity.  In response, these courts have

required that a plaintiff present proof of the unconstitutional motive of each defendant,

and have imposed on plaintiffs a "heightened standard," requiring plaintiffs to provide

particularized evidence of a direct or circumstantial nature that demonstrates the required

state of mind in order to avoid summary judgment on the defense of qualified immunity.[1]

*Blue v. Koren*, 72 F.3d at 1084.  ("[T]he plaintiff must proffer particularized evidence of

direct or circumstantial facts as suggested in Justice Kennedy's concurrence in *Siegert v.*

*Gilley*,  500 U.S. 226, 111 S.Ct. 1789, 1795 (1991) supporting the claim of an improper

motive in order to avoid summary judgment.")  Particularized evidence of improper

motive include expressions by the state officials regarding their state of mind,

_____

[2]The "heightened standard" required by the Second Circuit is different from the
"heightened standard" that the D.C. Circuit imposed on plaintiffs in Crawford-El v.
Britton, 93 F.3d 813 (D.C. Cir. 1997), which the Supreme Court held was improper.
Crawford-El v. Britton, supra, 118 S.Ct. 1584 (1998).  In Crawford-El, the D.C. Circuit
required a prisoner to adduce clear and convincing evidence of improper motive in order
to defeat a motion for summary judgment on the ground of qualified immunity.  Thus,
requiring the plaintiff to meet a heightened burden of proof.

    The heightened standard "required by the Second Circuit requires the plaintiff to
offer specific evidence of unconstitutional motive which "we [the Second Circuit] are
doubtful that it imposes a burden greater than is already required under Fed. R. Civ. P.
56…[We] confess considerable doubt as to whether the heightened standard is really
heightened or is simply an application of the rule that conclusory assertions are
insufficient to defeat a motion for summary judgment." Blue, supra, 1083-84.  The
Second Circuit's approach was impliedly approved by the Supreme Court in Crawford-
El, supra.

    "[F]irm application of the Federal Rules of Civil Procedure is fully warranted and may
lead to the prompt disposition of insubstantial claims."  Id. at 1596, quoting Harlow v. Fitzgerald, supra, 102
S.Ct. at 2739, fn. 35).

circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.  *Blue*, 72 F.3d at 1084.

In  *Blue v. Koren*, the Second Circuit articulated that the following framework should be used when a motion for summary judgment is based upon the ground of qualified official immunity:

> [T]he first issue is whether a clearly established right is at stake.  See Siegert, 111 S.Ct. at 1793.  If it is the court must then address whether the conduct was objectively reasonable.  If not, the motion must be denied.  If the conduct was objectively reasonable, a conclusory proffer of an unconstitutional motive should not defeat the motion for summary judgment.  The  reasonableness of the conduct is itself substantial evidence in  support of the motion  and requires in response a particularized proffer of evidence of unconstitutional motive.

Id. at 1084.

While it may be clearly established that the plaintiff has a right under the Equal Protection Clause not to be treated adversely in public employment, it is equally clear that Sanders and Cochran's conduct was objectively reasonable under the circumstances. The plaintiff has offered no credible evidence to suggest that under the circumstances described above their decision to terminate plaintiff would violate clearly established law. This is especially so in light of the same punishment that was given to other employees that were terminated while in their working test period(s). (See 56A Statement, ¶'s 34, 35, 36, 37 and 38). The evidence clearly shows that the decision to terminate Armstrong does not violate any clearly established law.  There is simply no evidence suggesting an "unconstitutional motive" on the part of defendants Flattery, Scherer, Farieri and Jones. Therefore, if the Court reaches the issue of qualified immunity, defendants Flattery, Scherer, Farieri and Jones are entitled to summary judgment.

### C.     PLAINTIFF'S STATE LAW CLAIMS ARE BARRED BY THE ELEVENTH AMENDMENT AND SOVEREIGN IMMUNITY.

In Counts Two and Four of the plaintiff's complaint, she alleges violations of Section 46a-60(a)(1) and 46a-60 (a)(4) of the Connecticut Fair Employment and Practices Act (hereinafter "CFEPA"), Conn. Gen. Stat. § 46a-60.

Under these provisions, she advances two claims:

(1)     DSS violated CFEPA when they classified her as an SST because of her race, and terminated her for complaining about her classification; and (2) DSS terminated her as a result of her disability. The plaintiff's claims against DSS and Flattery, Farieri, Scherer and Jones, in their official capacity, are barred by the Eleventh Amendment and the Doctrine of Sovereign Immunity.

### D.     CLAIMS AGAINST THE STATE AND DEFENDANTS FLATTERY, FARIERI, SCHERER AND JONES, ACTING IN THEIR OFFICIAL CAPACITY.

The Eleventh Amendment to the United States Constitution bars a suit in federal court against a state or one of its agencies for equitable or legal relief unless the state has expressly consented to be sued, or Congress explicitly abrogates state immunity. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99-100 (1984). Dube v. State of New York, 900 F.2d 587, 594 (2d Cir. 1990); Daisernia v. State of New York, 582 F.Supp. 792 (N.D.N.Y.1984)  There is no dispute that the Department of Mental Health and Addiction Services is a state agency.

The doctrine of State sovereign immunity and its breadth vis-a-vis the Eleventh Amendment have been discussed at length in several recent Supreme Court decisions.

See Alden v. Maine, 527 U.S. 706 (1999); Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996); see also Board of Trustees of the University of Alabama v. Garrett, ___ U.S___, 121 S.Ct. 955 (Feb. 21, 2001) (discussing Congressional abrogation of a State's sovereign immunity in the context of the Americans With Disabilities Act); Kimel v. Florida Board of Regents, 528 U.S. 62 (Jan.11, 2000) (discussing Congressional abrogation under the Fourteenth Amendment of a State's sovereign immunity and express waiver by a State).

The doctrine of State sovereign immunity finds expression in the Eleventh Amendment, which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or in equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." However, in interpreting the scope of the States' constitutional immunity from suit, the Supreme Court has looked to the historical concept of State sovereign immunity rather than adhering to the literal wording of the Eleventh Amendment. Thus, in Hans v. Louisiana, 134 U.S. 1, 14-15 (1890), the Supreme Court held that sovereign immunity barred a citizen from suing his own State. Moreover, it is well settled that State immunity extends not only to the States but also to State agencies and to State officers who act on behalf of the State. See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 142-47 (1993); Farricielli v. Holbrook, 215 F.3d 241, 245 (2d Cir. 2000).

Although State sovereign immunity is often referred to as "Eleventh Amendment Immunity," the Supreme Court has recently reaffirmed that a State's sovereign immunity far exceeds the literal words of the Eleventh Amendment. As the Supreme Court

explained, the phrase "Eleventh Amendment Immunity" is "a convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment."[3]  Alden, 527 U.S. at 713; *see also* Burnette v. Carothers, 192 F.3d 52, 55-56 n.1 (2d Cir. 1999), *cert. denied*, 121 S.Ct. 657 (2000).

> Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the State's immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.

Alden, 527 U.S. at 713.  In Alden, the Supreme Court held that sovereign immunity protected a non-consenting State from an action brought against it in State Court under the Fair Labor Standards Act.  *See also* In re Mitchell, 209 F.3d 1111 (9th Cir. 2000) (holding that an adversary proceeding in bankruptcy court by a Chapter 7 debtor against two State agencies, seeking to determine the dischargeability of a state tax debt, was barred by the Eleventh Amendment).  Accordingly, our inquiry in this case is not constrained by the literal words of the Eleventh Amendment, which speak only of the "Judicial power of the United States."  Instead, our analysis must encompass the broader, historical concept of sovereign immunity.  As the Fourth Circuit held in South Carolina

---

[1] [3]As the Supreme Court discussed in Alden, 527 U.S. at 715-21, the Eleventh Amendment was adopted in response to the Supreme Court's decision  *in* Chisholm v. Georgia, 2 Dall. 419 (1793), in which the Court held, just five years after the Constitution was adopted, that Article III authorized a private citizen of another state to sue the State of Georgia without its consent.  Congress reacted to this "unexpected blow to state sovereign," Alden, 527 U.S. at 720, by adopting the Eleventh Amendment which was intended to restore, not to change, the original constitution design.  Id. at 721.  "By its terms, then, the Eleventh Amendment did not redefine the federal judicial power but instead overruled the Court."  Id. at 722.

State Ports Authority v. Federal Maritime Commission, ___F.3d___, 2001 WL 243218 (4th Cir. 2001), Alden makes clear that the States' sovereign immunity applies to adversarial proceedings brought by a private party against a non-consenting State, regardless of the forum.  2001 WL 243218, at *3.  Thus, "[i]n short, unless waived or validly abrogated,[4] immunity bars the assertion or adjudication of claims made against a state by a private party and it protects a state from being required to appear and defend itself against such claims regardless of the forum in which those claims are made."  State of Rhode Island Dept. Environmental Management v. United States, 115 F. Supp.2d 269, 274 (D.R.I. 2000).

For a lawsuit against a state based on a state statute, federal statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, there must be clear language evidencing an intention to subject the state to suit in federal court. Atascadero State Hospital v. Scanlon, 473 U.S. 234, 240 (1985).

Connecticut law has long recognized the common law doctrine that the state may not be sued without its consent.  Since the state can only act through its officers and agents, a suit against a state officer is effectively a suit against the state itself.  Horton v. Meskill, 172 Conn. 615, 623, 376 A.2d 359 (1977).  Absent legislative authority, the courts must decline to permit any monetary award against the state or its officials acting within the scope of their employment. There are three instances in which the state or its agents may be sued.  They are when: (1) the state has expressly waived sovereign

---

2 [4]There are two well-settled exceptions to State sovereign immunity from private suits-- when a State unequivocally waives its sovereign immunity and when there has been a valid abrogation by Congress of the States' sovereign immunity pursuant to its powers under the Fourteenth Amendment.  See, Seminole Tribe of Florida, 517 U.S. at 55, 65.

immunity through legislation or by consenting to suit; (2) an action merely seeks declaratory or injunctive relief based on a claim of constitutional violation; or (3) an action seeks declaratory or injunctive relief based on a claim that an official exceeded his statutory authority.  White v. Burns, 213 Conn. 307, 312, 567 A.2d 1195 (1990).

This principle is further supported by the common law precedent that the state is not liable under the doctrine of respondeat superior for the negligence of their officers, servants and agents in the performance of their governmental functions.  Bergner v. State, 144 Conn. 282, 285 (1937); Hewison v. New Haven, 37 Conn. 475, 483 (1871); Pope v. New Haven, 91 Conn. 79, 80, 99 A. 51 (1916).  It is within this historical context that in 1959 the legislature enacted a statutory procedure for waiving the state immunity to suits for damages. The General Assembly established the Office of  the Claims Commissioner, for the adjudication of claims against the state or for permission to sue the state.  See, Conn. Gen. Stat. §§ 4-141, 4-158, 4-160.[5]

However, the state's waiver of its sovereign immunity does not provide for a direct legal action against the state.  Before suit may be filed, permission to sue the state must be obtained by a claimant using the statutory procedure outlined in Conn. Gen. Stat. §§ 4-147 through 4-158. Section 4-160 explicitly states:

> When the Claims Commissioner deems it just and equitable, he may authorize suit against the state on any claim which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could be liable.

Conn. Gen. Stat. § 4-160.

---

3 [5]State employees enjoy absolute statutory immunity from suits against them individually for negligent acts caused in the discharge of their duties or within the scope of their employment.  Conn. Gen. Stat. § 4-165.

Since in the present action the Plaintiff does not allege facts demonstrating consent from the Claims Commissioner to bring an action against the state for the negligent conduct of any state official, her claim against the state for the negligent infliction of emotional distress must fail.

### D.    IN ENACTING CFEPA, THE LEGISLATURE EXPRESSLY LIMITED ITS WAIVER OF SOVEREIGN IMMUNITY TO SUITS BROUGHT IN THE STATE COURT.

In enacting CFEPA, the State of Connecticut did not waive its Eleventh Amendment immunity to suits in federal court. Sections 46a-99 and 46a-100 expressly limit suits to redress violations of CFEPA to actions brought in the state Superior Courts. Section 46a-100 states:

Any person who has timely filed a complaint with the Commission on Human Rights and Opportunities in accordance with section 46a-82 and who has obtained a release from the commission in accordance with section 46a-83 or 46-101, may also **bring an action in the superior court for the judicial district in which the discriminatory practice** is alleged to have occurred or in which the respondent transacts business, except any action involving a state agency or official may be brought in the judicial district of Hartford.

Conn. Gen. Stat. § 46a-100 (emphasis added).

The issue of the state's waiver of its immunity for redress of unfair employment practices in federal court was addressed recently by this court in the case of  Walker v. State of Connecticut, 106 F. Supp. 2d 364 (D.Conn 2000).  In Walker, a former deputy

sheriff sued the department and county officials for the alleged discriminatory practices

prohibited by Title VII of the Civil Rights of 1964.  Included within the plaintiff's

federal lawsuit were several causes of action for violations of CFEPA.  In granting the

defendants motion to dismiss the state law claims, the court stated:

> Counts Four and Eight of the Complaint allege violations of the CFEPA.
> The only way Plaintiff may bring a CFEPA claim in federal court against
> the State is by the consent of the State to be sued in that forum.  The State
> has waived its immunity, but only as to cases brought in the Superior
> Court.  Conn. Gen. Stat. Section 46a-99 provides that:
> Any person claiming to be aggrieved by a violation of any provision of
> sections 46a-70 to 46a-78, inclusive, may petition the superior court for
> appropriate relief and said court shall have the power to grant such relief,
> by injunction or otherwise, as it deems just and suitable.
> "A state does not consent to suit in federal court by consenting to suit in
> the courts of its own creation."  Smith v. Reeves, 178 U.S. 436, 441-445,
> 44 L.Ed. 1140, 20 S.Ct. 919 (1900).  This Court declines Plaintiff's
> invitation to hold that simply because the State has consented to be sued in
> state court, it a fortiori must have meant to consent to federal jurisdiction
> also.  "It is not consonant with our dual system for the federal courts . . . to
> read the consent to embrace federal as well as state courts . . . [A] clear
> declaration of the state's intention to submit its fiscal problems to other
> courts than those of its own creation must be found."  Great Northern Life
> Insurance Co. v. Read, 322 U.S. 47, 54, 88 L.Ed. 1121, 64 S.Ct. 873
> (1944)(emphasis added), quoted in Pennhurst State School & Hosp. v.
> Halderman, 465 U.S. 89, 99-100 n. 9, 79 L. Ed.2d 67, 104 S.Ct. 900
> (1983). . . n. Summary judgment will be granted on the CFEPA claims as
> to the State and all Defendants in both their individual and official
> capacities, as this Court lacks jurisdiction over the parties based on the
> clear reading of the statute.

Id. at 370.[6]


The reasoning in Walker is equally applicable to the present case. The Plaintiff's

state law claims against the Department of Social Services and Flattery, Farieri, Scherer

---

4 [6]Conn. Gen. Stat. § 46a-100 which provides for a civil action to redress violations not
encompassed within 46a-70 to 46a-78, 46a-81h and 46a-81o, contains the same limited
waiver of immunity for suits brought in the state superior court.

and Jones predicated on violations of CFEPA are barred by the doctrine of sovereign immunity and may not be brought in federal court by virtue of the Eleventh Amendment.

### E. THE PLAINTIFF IS UNABLE TO ESTABLISH THAT SHE SUFFERED RACE OR NATIONAL ORIGIN DISCRIMINATION.

#### 1. Under Title VII, The Plaintiff Has The Burden Of Proof

In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof," that applies both to Title VII discriminatory-treatment cases, St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993), and to cases arising under the ADEA. Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997)(en banc).

According to the Supreme Court, the plaintiff in an employment discrimination case has the burden at the outset of "proving by a preponderance of the evidence a prima facie case of discrimination." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 251, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); see also McDonnell Douglas, 411 U.S. at 802. If the plaintiff succeeds in establishing a prima facie case, the burden of production shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its action. McDonnell Douglas, 411 U.S. at 802. "Any legitimate, nondiscriminatory reason will rebut the presumption triggered by the prima facie case." Fisher, 114 F.3d at 1335-1336. "Thus, 'the defendant need not persuade the court that it was actually motivated by the proffered reasons' in order to nullify the presumption and obligate the plaintiff to satisfy the burden of proof." Fisher, 114 F.3d at 1335-36 quoting

<u>Burdine</u>, 550 U.S. at 254; <u>see</u> <u>also</u> <u>Meiri v. Dacon</u>, 759 F.2d 989, 996 n. 11 (2d Cir. 1985).

"If the defendant articulates a nondiscriminatory reason for its actions, 'the presumption raised by the prima facie case is rebutted,'" <u>Fisher</u>, 114 F.3d at 1336, and "simply drops out of the picture." <u>St. Mary's</u>, 509 U.S. at 511. At this point, the plaintiff has an opportunity to prove by a preponderance of the evidence that the employer's reason was "a pretext for discrimination." <u>Burdine</u>, 450 U.S. at 253; <u>McDonnell-Douglas</u>, 411 U.S. at 804. In order to meet this burden, the plaintiff must show by a preponderance of the evidence "*both* that the reason was false, *and* that discrimination was the real reason." <u>Fisher</u>, 114 F.3d at 1339, quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U. S. 502, 515, 113 S. Ct.  2742, 125 L.Ed.2d 407 (1993)(italics  in original). It is not enough for the plaintiff simply to show that the employer's proffered reason for its actions was not the real reason. <u>Fisher</u>, 114 F.3d at 1337-1338.  Thus, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>St. Mary's</u>, 509 U.S. at 507; <u>Burdine</u>, 450 U.S. at 253.  In the present case, the plaintiff cannot meet this burden.

**2.     Plaintiff Cannot Establish A Prima Facie Case Of Race Because She Suffered No "Adverse Employment Action" And She Cannot Produce Evidence of Circumstances Giving Rise To An Inference of Discrimination**

To defeat a motion for summary judgment on a claim of discriminatory treatment under Title VII, the plaintiff must prove:

(1) that he belongs to a protected class; (2) that he was performing his duties satisfactorily; (3) that he was subjected to an adverse employment action; and (4) that the adverse action occurred in circumstances giving rise to an inference of discrimination

on the basis of his membership in that class. McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

While the plaintiff's complaint is silent on the notion of disparate treatment, the incidents that he refers to in his complaint allude to the argument that he is being treated differently on account of his race and national origin.

In the context of a Title VII disparate treatment claim, the prima facie element of an "adverse employment action" requires more than simply an unpleasant situation. Wanamaker v. Columbian Rope Co., 108 F.3d 462 (2d Cir. 1997). While it is true that federal law does not interpret this element so narrowly to confine the type of adverse action to only financial benefits or diminished duties, Rodriguez v. Board Of Educ., 620 F.2d 362 (2d Cir. 1980), it is equally true that not everything that makes an employee unhappy or distressed rises to the level of an adverse employment action. Smart v. Ball State Univ., 85 F.3d 270, 274 (7th Cir. 1996). The essence of an adverse employment action is some detriment to the employee's position more than mere inconvenience or an

alteration of the job. <u>Crady v. Liberty National Bank & Trust Co</u>., 993 F.2d 132, 136 (7th Cir. 1993); <u>Bowman v. Shawnee State Univ</u>., 220 F.3d 456, 461-62 (6th Cir. 2000).

The evidence clearly establishes that the plaintiff's race was not taken into consideration when they classified her as an SST instead of a CCT upon her employment with the agency.  (**Exh. 5**, Marshall Deposition, pp. 10:2-11:17, pp. 15:20-16:6, p. 35:3-7. (**Exh. 5**, Marshall Deposition, p. 16:18-19; pp. 40:19-41:1).

Additionally, it is clear that the plaintiff's termination from DSS was due to her excessive absences, and not due to her race or any other circumstance giving rise to an inference of discrimination.  (**Exh. 25, Exh. 1**, p. 11:11-12; 12:17-20; **Exh. 12**, ¶'s 8, 9, 10, 11, 12, 13, 14 and 24).

The plaintiff is unable to articulate circumstances giving rise to an inference of discrimination based upon her membership in a protected class.  The defendants' nondiscriminatory reasons for any of the actions taken which serve as the basis for plaintiff's complaint simply cannot be connected to her race.  Plaintiff, in short, has not suffered disparate treatment and, therefore, her claims cannot survive summary judgment.

**F.     THE PLAINTIFF HAS NOT STATED A CAUSE OF ACTION FOR RETALIATION.**

In order to prove a case of retaliation, the plaintiff must prove each of the following elements:

> (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action.

Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 292 (2d Cir. 1998).  "Upon such a showing, the defendant must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of showing that the Defendants' explanations are pretext for the true discriminatory motive."  Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996).

It is difficult to discern which, if any, of plaintiff's allegations speak to retaliation.  Paragraph 28 of plaintiff's Complaint alleges DSS violated Title VII when they classified her as an SST because of her race and terminated her in retaliation for complaining about her classification.

In the present case, the plaintiff's retaliation is at best, ambiguous.  She alleges in a general way that DSS terminated her in retaliation for complaining about her classification.  She admits that she never put anything into writing regarding any complaints against Farieri, Jones and Flattery.  (**Exh. 1**, 52:1-12).  Additionally, neither Farieri, Scherer, Flattery or Jones were involved in the hiring of her by DSS as an SST.  (**Exh. 12**, #20, 24; **Exh. 13**, #9, 10, 12 and 15; **Exh. 9**, #29, 30, 33).  Simply, the plaintiff is unable to demonstrate that there is a causal problem between any of the incidents as alleged in the complaint, e.g., her inquiry regarding her classification as an SST and her termination from DSS.

## **CONCLUSION**

For all of the foregoing reasons, the defendant(s) respectfully submit that there is no genuine dispute as to all of the material facts and that it is entitled to summary judgment as a matter of law.

DEFENDANTS
STATE OF CONNECTICUT
DEPARTMENT OF SOCIAL
SERVICES, ET AL.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:_____
Tammy D. Geathers
Assistant Attorney General
Fed. Bar No. ct22426
55 Elm  Street, P.O. Box 120
Hartford, CT  06141-0120
Tel:  (860) 808-5340
Fax: (860) 808-5383
Email:
Tammy.Geathers@po.state.ct.us


## CERTIFICATION

I hereby certify that a copy of the following **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was mailed this 5th day of August, 2004, first class postage prepaid, to:

Barbara E. Gardner, Esq.
843 Main Street, Suite 1-4
Manchester, CT 06040
Tel.: (860) 643-5543
Fax: (860) 645-9554



_____
Tammy D. Geathers
Assistant Attorney General