UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIANA ARMSTRONG | : | CIV. NO. 3:02CV2264 (AVC) |
|     *Plaintiff*, | : | |
| v. | : | |
| STATE OF CONNECTICUT, DEPARTMENT OF SOCIAL SERVICES, | : | AUGUST 5, 2004 |
|     *Defendant*. | | |

### DEFENDANT'S RULE 56(a)1 STATEMENT OF UNDISPUTED FACTS

1. The plaintiff, Tiana Armstrong, is a resident of Windsor, CT. (**Exhibit 1,** Excerpts from Deposition of Tina Armstrong, dated June 14, 2004, p. 7:14-25).

2. The Department of Social Services, (hereinafter "DSS"), posted a Revised Vacancy Notice for Eligibility Services Workers within the North Central Region. The notice included the wording "The position(s) may be underfilled at the Social Services Trainee or Connecticut Careers Trainee level" with a closing date of June 6, 2001. (**Exhibit 14**, DSS Revised Vacancy Notice, posting date May 22, 2001).

3. The job posting for Eligibility Services Worker specifically states "the positions will be filled by candidates who are eligible for appointment as an Eligibility Services Worker, SST or CCT, or the positions may be filled by existing lists which we are obliged to use." (**Ex. 14**, DSS Revised Vacancy Notice, posting date May 22, 2001).

1

4. Generally, at the beginning of the interview process, DSS's practice is to state to the candidates, the targeted classification level of Eligibility Services Worker. It is not DSS's normal practice to clarify during the interview process, whether the candidates are being interviewed at SST or CCT level. (**Exhibit 2,** Excerpts from Deposition of Lisa Owens, p. 9:8-19).

5. The plaintiff was hired by DSS as a Social Services Trainee (hereinafter "SST"), in their Hartford Office on or about August 17, 2001 (**Exhibit 15**, Letter dated August 13, 2001) from Lisa Owens, Personnel Officer, to Armstrong. (**Ex. 1**, Excerpts from Deposition of Tiana Armstrong, dated June 14, 2004, p. 10:21-25).

6. The plaintiff was informed to report to the Central Office, Human Resources Division on August 24, 2001 for orientation. (**Ex. 15**).

7. The plaintiff attended the personnel orientation session on August 24, 2001. At the orientation session, she was given a packet of handouts, including Department of Social Services' Time and Attendance Policy. (**Exhibit 16**, Performance Appraisal Narrative, p. 2).

8. On August 31, 2001, the plaintiff left a voice mail message for her supervisor, in which she indicated that she would not be at work that day because of the flu. (**Ex. 16**, Performance Appraisal Narrative, p. 2; **Ex. 1**, Excerpts from Deposition of Tiana

Armstrong, pp. 59:1-5; 60:13; 61:10; **Ex. 2,** Owens Deposition, p. 63:21-23).

9. On September 6, 2001, the plaintiff called her supervisor and informed her that she thought she had food poisoning and would be out sick. She did not report to work that day. (**Ex. 16**, Performance Appraisal Narrative, p. 2; **Ex. 1**, Armstrong Deposition, pp. 61:11-62:3; **Ex. 2**, Owens Deposition, p. 63:24-64:1).

10. On September 7, 2001, Ms. Armstrong used 1.5 hours of leave without pay for a doctor's appointment. She said the reason she was out was because of food poisoning. (**Ex. 16**, Performance Appraisal Narrative, p. 2; **Ex. 1,** Armstrong Deposition, pp. 62:4-64:23; **Ex. 2**, Owens Deposition, p. 64:2-4).

11. On September 17, 2001, the plaintiff was again absent. (**Ex. 1**, Armstrong Deposition 66:4-11; 66:20-25; 67:1-2; 67:7-25; 68:1-4; 68:7-21; **Ex. 16**, Performance Appraisal Narrative, p. 2; **Ex. 2**, Owens Deposition, p. 64:3-7). She agrees that she was absent for more than one day. (**Ex. 1**, Armstrong Deposition, p. 82:21-25; 83:1-23; 92:3-8).

12. On September 26, 2001, the plaintiff was scheduled for CORE Training. She called in that day at 7:15 a.m. and said she had a doctor's appointment and would be in at 8:30 a.m. (**Ex. 16**,

3

|     | |
| --- | --- |
|     | Performance Appraisal Narrative, p. 2; **Ex. 1,** Armstrong Deposition, p. 69:1-23; **Ex. 2**, Owens Deposition, p. 64:8-10). |
| 13. | The plaintiff did not give advance notice to her supervisor regarding her doctor's appointment on September 26, 2001. She reported to work that day at 1:00 p.m. (**Ex. 16**, Performance Appraisal Narrative, p. 2; **Ex. 1**, Armstrong Deposition, pp. 69:24 - 70:3). |
| 14. | On October 5, 2001, an informal counseling session was held due to plaintiff's five occasions of absence(s) from work. It was held pursuant to the agency's time and attendance policy. (**Exhibit 4**, Excerpt from Michele Farieri Deposition, dated June 9, 2004, p. 13:1-12). |
| 15. | The informal counseling session was not held due to her attendance problems until October 5, 2001 because she was at DSS Central Headquarters for CORE Training from September 27, 2001 to October 4, 2001. (**Ex. 16**, Performance Appraisal Narrative, p. 3). |
| 16. | The plaintiff received a letter of informal counseling for attendance issues on October 5, 2001 from he supervisor, Carol Scherer, that was also attended by Operations Manager, Michele Farieri. (**Exhibit 19**, Informal Counseling Memo to Armstrong, dated October 5, 2001; **Ex. 4,** Farieri Deposition, p. 11:13-25, 14:8-13). |

17. At the informal counseling session of October 5, 2001, the plaintiff was given a copy of the DSS's Attendance and Tardiness Guidelines.  (**Exhibit 20**, DSS Guidelines for Employee Attendance and Tardiness Revised March, 1998; **Ex. 4**, Farieri Deposition, p. 38:4-15).

18. The plaintiff was given a copy of the brochure the Employee Assistance Program (hereinafter "EAP") at the October 5, 2001 informal counseling session.  (**Exhibit 22**, EAP Brochure; **Ex. 4**, Farieri Deposition, p. 38:4-15).

19. The plaintiff was warned at the informal counseling session on October 5, 2001, that "any additional occasions of absence may result in administrative action up to and including dismissal."  (**Ex. 19**, Informal Counseling Memo dated October 5, 2001; **Ex. 3**, Scherer Deposition, p. 53:1-8).

20. The plaintiff informed her supervisor, Carol Scherer, and Michele Farieri, at the October 5, 2001 informal counseling session that she understood the policies, her responsibilities and said that it would not happen again.  (**Exhibit 23**, Notes of Michele Farieri dated October 5, 2001).

21. The plaintiff did not mention to either Carol Scherer or Michele Farieri that at the October 5, 2001 informal counseling session, that she suffered from migraine headaches.  (**Exhibits 3**, Excerpts from Carol Scherer Deposition, pp. 19:2-20:11).

22. There was no discussion at the informal counseling meeting on October 5, 2001 about the plaintiff getting a doctor's note to substantiate her absences. (**Ex. 3**, Scherer Deposition, pp. 25:18-26:2).

23. As an employee during the working test period, the plaintiff did not have a right to union representation at the October 5, 2001 informal counseling session pursuant to the collective bargaining agreement because the plaintiff was not yet a permanent employee. (**Ex. 4,** Farieri Deposition, pp. 19:23-20:2).

24. On October 18, 2001, the plaintiff was called into a second session by her supervisor, Carol Scherer. (**Ex. 3**, Scherer Deposition, pp. 61:24-62:13; **Exhibit 17**, pages 38 and 39 of the Collective Bargaining Agreement, effective July 1, 1999 to June 30, 2002).

25. The plaintiff requested to meet with Michele Farieri on October 18, 2001. However, she did not mention to Ms. Farieri at this meeting, that she suffered from migraines. (**Ex. 4**, Farieri Deposition, p. 24:17-21; p. 26:13-15; p. 26:19-22).

26. On October 25, 2001, the plaintiff's sixth occasion of absence from work, the plaintiff did not report to work. She called her supervisor in the morning and told her she would be out due to a migraine. (**Ex. 16**, Performance Appraisal Narrative, p. 3).

27. Ms. Armstrong informed her supervisor, Carol Scherer, that she suffered from migraine headaches on October 25, 2001. This was

6

|   |   |
|---|---|
|   | the first time that her supervisor heard about the plaintiff suffering from migraines. (**Ex. 3,** Scherer Deposition dated June 8, 2004, p. 12:12-25; p. 13:1-4; p. 53:14-17; **Ex. 2**, Owens Deposition, p. 64:11-17). |
| 28. | Lisa Owens, Personnel Officer for the North Central Region of DSS, recommended to Rudolph Jones, Director of Human Resources, that the plaintiff be dropped during her working test period due to attendance issues. (**Exhibit 24**, Memo dated October 29, 2001 from Owens to Jones). |
| 29. | The plaintiff was separated from state service by DSS for failure to complete her initial probationary period. The effective date of her separation from employment with the state was November 5, 2001. (**Exhibit 25**, Letter dated November 5, 2001 from Lisa Owens to the plaintiff; **Ex. 1**, Armstrong Deposition, p. 11:11-12; 12:17-20). |
| 30. | The plaintiff at the time of her dismissal from state service was an at-will employee and not covered under the Collective Bargaining Agreement inasmuch as she was in her working test period and not a permanent employee. She did not have any union rights. (**Exhibit. 6,** Excerpts from Rudolph Jones Deposition, dated June 15, 2004, pp. 9:11-20; p. 10:13-15). |
| 31. | An employee who is separated from state service during their working test period does not have union rights under the Collective Bargaining Agreement. They may request a union representative |

7

to accompany them to a SPERL Hearing regarding the dismissal. But, the representative would be there only in capacity to observe and provide advice. (**Exhibit 32**, Employee's Statutory Right to File Grievance; **Exhibit 29**, Letter dated April 11, 2002 to Jennings).

32. A SPERL Hearing satisfies an employee's statutory right to present grievances to the employer. DSS conducted a SPERL Hearing for the plaintiff after she was dropped from state service. (**Ex. 32**, Employee's Statutory Right to File Grievance; **Ex. 5**, Excerpts from Lily "Cookie" Marshall Deposition, p. 39:6-13).

33. The recommendation to drop the plaintiff from state service as well as the decision to terminate the plaintiff from state service was not due to her race, but due to the serious nature of absenteeism and unsatisfactory service rating she received, which was based on her absenteeism. (**Exhibit 8**, Affidavit of Lisa Owens, ¶ 32; **Exhibit 12,** Affidavit of Rudolph Jones, ¶¶ 13-19 and 21-25).

34. DSS treated the plaintiff the same as other similarly situated non-African American employees. Heather Schorr, a white female, was separated from state service (DSS) for failure to complete her working test period due to unsatisfactory work performance. (**Exhibit 26,** Letter dated August 4, 2000 from Owens to Schorr; **Exhibit 31**, DSS Response to CHRO Complaint No. 0210456, dated June 28, 2002).

35. Elizabeth Ethier, a white female, was separated from state service (DSS) for failure to complete her Connecticut Careers Trainee working test period due to her unsatisfactory work performance. (**Exhibit 27**, Letter dated June 30, 2000 from John Malmros to Ethier; **Ex. 31**, DSS Response to CHRO Complaint No. 0210456).

36. Steven Dunnrowicz, a white male, was separated from state service (DSS) for unsatisfactory performance during his working test period. (**Exhibit 28**, Letter dated March 27, 2002 from Maria Taylor to Steven Dunnrowicz; **Ex. 31**, DSS Response to CHRO Complaint No. 0210456).

37. Richard Jennings, a white male, was separated from state service (DSS) for unsatisfactory performance during his working test period. (**Exhibit 29**, Letter dated April 11, 2002 from Melvin Jackson; **Ex. 31**, DSS Response to CHRO Complaint No. 0210456).

38. Holly Genovese, a white female, was separated from state service (DSS) for unsatisfactory performance during her working test period. (**Exhibit 30**, Letter dated July 26, 2001 from Rudolph Jones to Holly Genovese; **Ex. 31**, DSS Response to CHRO Complaint No. 0210456).

39. When the plaintiff contacted Human Resources in or about October, 2001 to inquire why she was hired as an SST as opposed to a CCT, she had already reached her fifth occasion of absence.

      (Plaintiff's Amended Complaint dated April 23, 2004, ¶ 8; **Ex. 19**, Informal Counseling Memo dated October 5, 2001; **Ex. 4**, Farieri Deposition, p. 13:1-12).

40.     The plaintiff contacted Lily "Cookie" Marshall, who was with the personnel office with DSS at all relevant times to this matter, to inquire why she was hired as an SST, rather than as a CCT. (**Ex. 5**, Marshall Deposition, pp. 5:15-22; p. 7:4-20; p. 9:4-15).

41.     Marshall informed the plaintiff that there was an individual on the SEBAC List at the CCT level and that she could not be hired as a CCT until the individual on the SEBAC List was hired by some agency at that level. (**Ex. 5**, Marshall Deposition, pp. 10:2-11:17, pp. 15:20-16:6, p. 35:3-7; **Exhibit 17** Article 13, Section 5 of the P-2 Contract).

42.     The SEBAC List is a list of candidates who have been laid off from either a current agency or other agency. (**Ex. 5**, Marshall Deposition, p. 34:14-16).

43.     An individual on the SEBAC List who has the proper credentials must be hired and someone from the outside cannot be considered for the position. (**Ex. 2,** Owens Deposition, p. 13:13-17; **Ex. 18**, Permanent Appointments, Section 5-228-1 of the Regulations of Connecticut State Agencies).

44.     DSS, in hiring the plaintiff over the individual on the SEBAC List, exercised its right to underfill the position by not taking the

individual off the SEBAC List. (**Ex. 2**, Owens Deposition, p. 14:5-15).

45. DSS was within its rights and there was nothing procedurally incorrect when DSS elected to offer the position to the plaintiff. (**Ex. 2**, Owens Deposition, p. 14:19-25).

46. DSS could not hire the plaintiff in the CCT position/classification until the individual on the SEBAC List was hired. (**Ex. 5**, Marshall Deposition, p. 16:18-19; pp. 40:19-41:1).

47. The plaintiff was offered, and she accepted the SST position. (**Ex. 2**, Owens Deposition, p. 16:1-11).

48. On October 5, 2001, when the plaintiff had reached her fifth occasion of absence, and during/after her informal counseling session to address her numerous occasions of absences, the plaintiff at the end of the aforementioned session, met with Farieri to address the issue of why she was hired as an SST rather than a CCT. Farieri does not recall the plaintiff mentioning that she suffered from migraines. (**Ex. 3**, Scherer Deposition, p. 20:9-21; **Ex. 4**, Farieri Deposition, p. 15:11-20, p. 18:12-14; **Ex. 23**, Handwritten notes of Michele Farieri for October 5, 2001).

49. Farieri had no previous knowledge, prior to the October 5, 2001 informal counseling session with the plaintiff, that she "complained" or inquired of Human Resources why she was hired

as an SST rather than a CCT. (**Exhibit 10**, Affidavit of Michele Farieri, ¶¶ 14-16).

50. Carol Scherer had no input or involvement in the plaintiff being hired as an SST as opposed to a CCT; nor did Carol Scherer speak with anyone else regarding the plaintiff's being hired as an SST. Scherer's discussions with others, relative to the plaintiff, had to do with the plaintiff's attendance issues. (**Exhibit 9**, Affidavit of Carol Scherer, ¶¶ 6-15).

51. Rudolph Jones was not involved in the hiring of the plaintiff and he generally does not get involved in issues surrounding the hiring of individuals. He did not speak with the plaintiff, Carol Scherer, Michele Farieri or Silvana Flattery regarding the plaintiff's status as an SST/CCT. (**Ex. 12**, Affidavit of Rudolph Jones, ¶¶ 20-24).

52. Silvana Flattery was not involved in the hiring of the plaintiff, nor was she involved in the determination to drop the plaintiff from state service during her working test period. She did not have the occasion to speak with Lily "Cookie" Marshall, Rudolph Jones, Lisa Owens, Carol Scherer, or Michele Farieri about the plaintiff. (**Exhibit 13**, Affidavit of Silvana Flattery, ¶¶ 5, 10, 15. **Ex. 7**, Excerpts from Flattery Deposition pp. 8:24-9:20).

53. The plaintiff, after orientation, (and) during the period when she was initially hired by DSS, contacted Marshall to inquire about her classification as an SST as opposed to a CCT. Marshall explained

|     | |
| --- | --- |
|     | to the plaintiff why she was hired as an SST as opposed to a CCT. (**Ex. 5,** Marshall Deposition, pp. 8:20-9:7; 9:9-18; 10:2-21; 11:7-17). |
| 54. | Marshall contacted Lisa Owens and apprised her of her conversation with the plaintiff and the plaintiff's inquiries relative to her classification. Marshall did not speak with anyone else besides Lisa Owens, regarding the plaintiff's inquiries relative to her classification. (**Ex. 5**, Marshall Deposition, pp. 18:17-25; 19:1-25; 20:1-11. **Ex. 2**, Owens Deposition, pp. 16:1-11; 18:1-6). |
| 55. | The plaintiff did not follow up with Owens about the issue regarding her classification as an SST versus CCT. Owens did not discuss the plaintiff's employment with Silvana Flattery. (**Ex. 2**, Owens Deposition, pp. 18:23-25; 19:1-25; 20:1-25; 21:8-25). |
| 56. | The purpose of the October 5, 2001 meeting with the plaintiff, Carol Scherer and Michele Farieri was to discuss the plaintiff's excessive absences from work, and to address her attendance issues. (**Ex. 4**, Farieri Deposition, p. 13:1-12). The plaintiff had only spoken to Lily "Cookie" Marshall regarding her classification as an SST, and had not followed up with Lisa Owens regarding the aforementioned. (**Ex. 5**, Marshall Deposition, pp. 18:17-25; 19:1-25; 20:1-11; **Ex. 2**, Deposition of Lisa Owens, pp. 16:1-11; 18:1-6). |

57. The defendants, Carol Scherer, Michele Farieri, Silvana Flattery and Rudolph Jones, did not participate in the plaintiff being hired as an SST as opposed to a CCT, or had any knowledge that the plaintiff was hired by DSS as an SST instead of a CCT.  (**Ex. 9**, Affidavit of Carol Scherer ¶ 33; **Ex. 10**, Affidavit of Michele Farieri ¶ 16; **Ex. 12**, Affidavit of Rudolph Jones ¶ 20; **Ex. 13**, Affidavit of Silvana Flattery ¶ 9).

58. The plaintiff was hired by the defendant DSS as an SST, instead of a CCT because there was an individual on the SEBAC List at the CCT level and she could not be hired as a CCT until that person was hired by some other agency at that level, and not because she is African-American.   (**Ex. 5**, Marshall Deposition, pp. 10:2-11:7; pp. 15:20-16:6, p. 35:3-7; **Ex. 17,** Article 13, Section 5 P-2 Collective Bargaining Agreement; **Ex. 2**, Owens Deposition, p. 16:1-11; 18:1-6; 18:23-25; 19:1-25; 20:1-25; 21:9-25).

59. The plaintiff was terminated and/or dropped from her working test period due to attendance issues relative to her excessive absences; not because of her race or in retaliation for her inquiry regarding her classification of an SST opposed to a CCT.  (**Ex. 24**, Memo dated October 29, 2001 from Owens to Rudolph Jones; **Ex. 8**, Affidavit of Lisa Owens ¶¶ 32, 38; **Exh. 12**, Affidavit of Rudolph Jones ¶¶ 9, 10).

60. The plaintiff has not put forth any evidence that the defendant(s) retaliated against her for inquiring about her classification as SST versus CCT; nor has she put forth any evidence or documentation that she was terminated by the defendants because of her race. (**Ex. 1**, Armstrong Deposition, 50:22-51:2, 51:18-25; 52:1-12; 61:11-62:3; 64:4-23; 66:4-67:25; 69:1-70:3; 82:21-83:11, 83:12-14; 92:3-8).

61. Plaintiff did not identify herself as being disabled in her PER-301 Form when she was hired by DSS and did not put anything in writing regarding a medical condition. (**Ex. 1**, Armstrong Deposition, p. 50:3-24, **Ex. 12**, Affidavit of Rudolph Jones ¶ 18-19, **Exhibit 38** (undated) PER-301 Form submitted by Tiana Armstrong).

62. The plaintiff requested and received a P-33 Medical Certificate Form to be filled out from Personnel Officer Owens on September 26, 2001. (**Ex. 2**, Owens Deposition, pp. 28:21-29:20).

63. On September 26, 2001, the plaintiff did not mention at her meeting with Owens that she suffered from migraines. (**Ex. 2**, Owens Deposition, p. 29:21-23).

64. The plaintiff's medical certificate was received by DSS on October 29, 2001. (**Ex. 33**, Medical Certificate from Tiana Armstrong, dated October 29, 2001; **Ex. 2**, Owens Deposition, p. 33:6-9).

65. The plaintiff's medical certificate was construed as a request for FMLA Leave. Her request was denied because she was ineligible for FMLA Leave because she had not worked 1250 hours over the previous 12 months. (**Exhibit 34**, DSS Response to Armstrong regarding FMLA Leave, dated October 31, 2001).

66. The plaintiff did not request an accommodation pursuant to the Americans With Disabilities Act. She did not indicate she was disabled and seeking an accommodation for migraines. (**Ex.** 2, Owens Deposition, p. 43:7-8; p. 44:4-6, 19-21).

67. The plaintiff was let go from DSS because of her excessive absenteeism. (**Exhibit 35**, Article 11, Section One of Collective Bargaining Agreement; **Exhibit 36**, Regulations of CT State Agencies; **Ex. 16**, Plaintiff's Performance Appraisal with attached 3 page narrative dated October 26, 2001; **Exhibit 37**, Article Nine, Section Three P-2 Collective Bargaining Agreement effective July 1, 1999 to June 30, 2002).

68. The plaintiff filed a complaint with the CHRO which was subsequently dismissed. (**Exhibits 39 and 40**).

              DEFENDANT
              STATE OF CONNECTICUT
              DEPARTMENT OF SOCIAL
              SERVICES

              RICHARD BLUMENTHAL
              ATTORNEY GENERAL


       BY:_____
          Tammy D. Geathers
          Assistant Attorney General
          Federal Bar No. ct22426
          55 Elm Street, P.O. Box 120
          Hartford, CT 06141-0120
          Tel: (860) 808-5340
          Fax: (860) 808-5383
          Email:
          Tammy.Geathers@po.state.ct.us


## **CERTIFICATION**


  I hereby certify that a copy of the following **Local Rule 56(a) Statement of Undisputed Facts** was mailed this 5th day of August, 2004, first class postage prepaid, to:

Barbara E. Gardner, Esq.
843 Main Street
Suite 1-4
Manchester, CT 06040
Tel.: (860) 643-5543
Fax: (860) 645-9554


            _____
            Tammy D. Geathers
            Assistant Attorney General