COPY

1

```
 1
 2                UNITED STATES DISTRICT COURT
 3                   DISTRICT OF CONNECTICUT
 4
 5
 6   TIANA ARMSTRONG           :  Civil Action No.
                               :  3:02CV2264 (AVC)
 7              v.             :
                               :
 8   STATE OF CONNECTICUT      :
     DEPARTMENT OF SOCIAL      :
 9   SERVICES                  :  June 9, 2004
10
11
12
13              DEPOSITION OF LISA OWENS
14
15
16
17
18
19
20
21
22            BARBARA C. LETSON
          Licensed Shorthand Reporter
23            49 Long View Drive
        Simsbury, Connecticut  06070
24            (860) 658-0500
            FAX (860) 658-1199
25
```

EXHIBIT NO. 2

L I S A   O W E N S,

             a Witness herein, having
             been first duly cautioned and
             sworn by Barbara C. Letson, a
             Notary Public commissioned and
             qualified within and for the
             State of Connecticut, deposed
             and testified as follows:

DIRECT EXAMINATION BY MS. GARDNER:

     Q    Good afternoon, Ms. Owens. My name is Barbara
Gardner, and I represent Tiana Armstrong in this case
that's been brought against DSS and is pending in District
Court. We are here today to take your deposition. Have
you been deposed before?
     A    Yes.
     Q    Okay. I will just go over a few of the basic
rules. You have to make all your answers verbal. Let me
finish my question before you start your answer. If
there's an objection, wait, hold your answer until your
attorney instructs you what to do. If you don't
understand one of my questions, tell me what you don't
understand and I will rephrase or clarify so you do
understand. And if at any time you want to take a break,

1  encompassed individuals that were possessed with bachelors
2  degrees or not.
3      Q   Okay.  Do you remember if the individuals in
4  that interview actually provided copies of their degrees?
5      A   Generally, we do request that candidates
6  provide copies at the interview.  However, I do not recall
7  if everyone provided copies of their degrees at that time.
8      Q   Okay.  Would it have been your practice to say
9  at the time of the interview what position you were
10 interviewing for?
11     A   Generally, at the beginning of the interview
12 process, we state the targeted classification; eligibility
13 of services worker, in this particular case is the
14 position that we are interviewing for.
15     Q   And you believe you did that in this case?
16     A   Yes.  We don't generally clarify whether the
17 interviews are for the SST level, the CCT level, or the --
18 well, we indicate the targeted classification of
19 eligibility services worker.
20     Q   Okay.  Do you know whether you knew during
21 that interview that Tiana had a degree?
22     A   Most likely I did, just based on the review of
23 her application materials.
24     Q   Okay.
25     A   Yes.

1    Q    Okay. What's next?

2    A    The next step before the offer letter would
3 be, naturally, the recommendation to come to me for hire.
4 We also send our recommendation as part of the procedure
5 to the Affirmive Action Division for approval. When the
6 approval comes back, at that time then phone calls are
7 made to candidates who are selected for employment.

8    Q    Okay. How do the Affirmative Action
9 requirements fit in with the SEBAC list? Which takes
10 precedence?

11    A    The reemployment list would take precedence.

12    Q    Okay.

13    A    If there are candidates on the reemployment
14 list who possess primary rights to a position, we can't
15 even offer employment to candidates from outside a state
16 service.

17    Q    Okay.

18    A    So in that case, it would not even reach the
19 Affirmative Action Division.

20    Q    Okay. Now, I think I asked you this before
21 and I can't remember where I went after that, but at some
22 point did you learn that there could not be a CCT hiring
23 because there was somebody on the SEBAC list who would
24 have trumped anyone from outside?

25    A    Yes.

1   Q   And how did you learn that?

2   A   During the vacancy-posting process, we obtain
3   the actual reemployment certification listing.

4   Q   Okay.

5   A   At that point, upon review, at some point it
6   was determined that there was an individual on the
7   reemployment list who possessed primary right to the
8   classification of Connecticut Careers Training.

9   Q   Okay. And do you know why that person wasn't
10  just put into that position?

11  A   We exercise -- the northern region exercised
12  its right to fill the position from outside of the state
13  service.

14  Q   To underfill the position, is that the term?

15  A   To underfill the position; correct.

16  Q   And was there anything, as far as you know,
17  that was wrong about that, or I mean, is that something
18  that's done in the normal course?

19  A   That's a standard operating procedure.

20  Q   Do you know why you didn't want to hire this
21  individual?

22  A   Not that I didn't want to hire that
23  individual. It was just the fact that I wanted to
24  exercise our options of hiring candidates from outside of
25  state service.

1    when I called to offer the position of Social Services
2    trainee to Tiana, during the conversation, she did
3    indicate that or question the fact that she was qualified
4    to fill the Connecticut Careers trainee level. And at
5    that point I advised her that I was not authorized to
6    offer her the position of Connecticut Careers trainee, but
7    rather I was also authorized to offer her the position of
8    Social Services trainee.
9        Q    And what did she say?
10       A    She accepted the position.
11       Q    Okay.
12       A    Of Social Services trainee.
13       Q    Okay.
14       A    Which I also advised her during that telephone
15   call that there was a two-year training period.
16       Q    Okay.
17       A    For the Social Services trainee position.
18       Q    Okay. And then did you send her an offer
19   letter?
20       A    I sent her a letter of confirmation.
21       Q    Okay.
22       A    Confirming the fact that she had accepted the
23   position.
24              (Defendant's Exhibit Number 1:
25              Marked for Identification.)

1           Q     And do you remember approximately when that
2    was?
3           A     I don't remember approximately when it was.
4    However, it was during the period where Tiana attended
5    core training in our central office, so I would presume
6    within a month of Tiana's employment.
7           Q     Okay.  And was that the first that you had
8    heard anything about Tiana following her beginning work in
9    August of 2001?  In other words, I assume that you didn't
10   have any day-to-day contact with Tiana?
11          A     No, I did not.
12          Q     So you sent her this confirmation letter; she
13   began work in August 2001.  Did you see her at any time
14   after she was employed?
15          A     Um, I can't recall specific dates in which I
16   may have seen her, but I'm sure that in passing that I saw
17   her.
18          Q     Okay.  So you don't recall any specific
19   conversations you had with her, when the first time you
20   spoke with her was, or anything --
21          A     Other than to say hi, just, you know, general
22   courtesies, no.
23          Q     Okay.  So Cookie called you, and what did she
24   say?
25          A     Cookie indicated that she had received a visit

1   from one of my staff members inquiring as to why she was

2   placed in the position of Social Services trainee when she

3   was qualified to fill the position of Connecticut Careers

4   trainee.

5       Q   Okay. What did you say?

6       A   I immediately reminded Cookie that the reason

7   why we could not offer or could not bring Tiana in as a

8   Connecticut Careers trainee is because there wasn't an

9   alternative on the reemployment list for Connecticut

10  Careers trainee.

11      Q   And what did Cookie say?

12      A   She then recalled knowing that information.

13      Q   Okay.

14      A   And she indicated that she would contact Tiana

15  to communicate with the north central region Human

16  Resources Division if she had any further questions.

17      Q   And that would be you?

18      A   Would have either been myself or Jean

19  Anderson.

20      Q   Okay. Did you have any other conversations

21  with Cookie about that?

22      A   No. That was basically it.

23      Q   Okay. Did she tell you that Tiana was going

24  to be following up with you about that?

25      A   She did not tell me that Tiana would be

1    following up with me. She told me that she would advise
2    Tiana that if she had any further questions to follow up
3    with the north central region human resources office.
4        Q    Okay. Did you have any feelings about the
5    fact that Tiana was now asking somebody else about this
6    issue?
7        A    No.
8        Q    Okay. Because you had not explained to Tiana
9    the reason why you weren't authorized to offer her the CCT
10   position?
11       A    Correct.
12       Q    And at this point was it your understanding
13   that Tiana has been told that by Cookie?
14       A    No. When Cookie called me, I had to remind
15   her of why Tiana was offered and brought in at the SST
16   level.
17       Q    Right.
18       A    So my understanding was that at the time
19   Cookie spoke with Tiana regarding that issue that she
20   didn't recall that situation so she couldn't have shared
21   that with Tiana because she didn't remember at the time.
22       Q    Was it your impression, though, that Cookie
23   then got back to Tiana and explained?
24       A    No.
25       Q    Would that have been inappropriate for Cookie

```
 1    to share that information?
 2         A    To -- excuse me?
 3         Q    To share the information as to why you could
 4    not offer Tiana the CCT position.  In other words --
 5         A    No.
 6         Q    -- to say --
 7         A    No, that would not have been inappropriate.
 8         Q    Okay.  Did Tiana follow up with you on that
 9    issue at all?
10         A    No.
11         Q    Do you know if she followed up with Jean
12    Anderson?
13         A    I don't believe she did.
14         Q    Okay.  Did you make a note anywhere of that
15    conversation with Cookie Marshall?
16         A    No.
17         Q    Did you tell Jean Anderson about it?
18         A    No.
19         Q    Okay.
20         A    Let me backtrack.  I may have mentioned it
21    just in passing to Jean Anderson --
22         Q    Okay.
23         A    -- that, you know, maybe she should expect a
24    visit from Tiana and just to, you know, refresh Jean as my
25    supervisor as to the reasons why.
```

```
 1        Q    Okay.  Why?

 2        A    Because for an employee in an initial working

 3   test period, six occasions is quite excessive.

 4        Q    Okay.

 5        A    And unacceptable and unsatisfactory.

 6        Q    Is that outlined anywhere in Exhibit 2?

 7        A    No.

 8        Q    Is there anything about that in Exhibit 2?

 9        A    No, no.

10        Q    Okay.  Is there any document that says what

11   you just told me, that it's unsatisfactory for an employee

12   in a working test period to have six absences?

13        A    No.

14        Q    Are there any qualifiers to that statement,

15   for example, if someone had a chronic medical condition

16   that caused, you know, all or some of those absences,

17   would that change your statement that six absences is

18   excessive?

19        A    Would you rephrase that question, please,

20   because you just touched upon three different areas.

21        Q    Okay.  Well, let me approach it from a

22   different way.  Did you at some point receive a P33

23   medical certificate for Tiana?

24        A    Yes.

25        Q    Okay.  And prior to receiving the completed
```

1  forms, did Tiana meet with you and ask you for the form?
2      A    Yes.
3      Q    Okay. And tell me about that meeting. Do you
4  know when that was in relation to, for example, the
5  informal counseling?
6      A    That meeting, I believe, occurred in
7  September.
8      Q    Okay.
9      A    It was following an absence that Tiana had
10 had. I believe it was she called in and indicated that
11 she had a doctor's appointment.
12     Q    Okay.
13     A    When she came in, she stopped in the human
14 resources office.
15     Q    Uh-huh.
16     A    And inquired as to -- or made reference to the
17 fact that she had a medical condition which was inhibiting
18 her from reporting to work. At that point in time, she
19 was given a P33(a), which is a medical certificate, and
20 she was reminded of the importance of attendance.
21     Q    Okay. Did she tell you at that time that she
22 had migraine headaches?
23     A    No.
24     Q    Okay. Did she say that she had a chronic
25 medical condition?

1   A    Because there's no other means in which to
2   approve an intermittent leave for an employee.
3   Q    Well, it was possible, wasn't it, from that
4   point on that she might not be absent; isn't that right?
5   A    It's possible, yes.
6   Q    Now, at the time you got that form, which I
7   believe was around October 29th, do you have any memory of
8   when that would have been?  Does that sound about right?
9   A    That sounds about right.
10  Q    Okay.  It's true, isn't it, that Tiana was in
11  the process of being terminated?  The decision had been
12  made to terminate her at the time you got that form; is
13  that right?
14  A    Correct.
15  Q    When was the decision made to terminate her?
16  A    I believe the decision, I want to say it was
17  in and around October 26th, which was her final occasion
18  of absence.
19  Q    Okay.  And on October 26th you did not know
20  that she suffered from a chronic medical condition; is
21  that correct?
22  A    I did not know that she -- no.  On
23  October 26th she had already been given the medical
24  certificate because she had indicated that she had a
25  chronic medical condition.

1   interpreted the contract, and the guidelines for family
2   medical leave.
3       Q    Did you refer the situation to the ADA
4   coordinator?
5       A    I did not.
6       Q    And why not?
7       A    At no point did Ms. Armstrong indicate that
8   she was seeking an ADA accommodation.
9       Q    Is it your understanding that she needs to do
10  that?
11          MS. GEATHERS:  Objection to the
12          question.  She indicated that she did not seek
13          an ADA accommodation.
14          MS. GARDNER:  And my question --
15          MS. GEATHERS:  So she would have to seek
16          an ADA accommodation in order for her to
17          accommodate the request.
18  BY MS. GARDNER:
19      Q    Is that your understanding, that she has to
20  say, I'm asking for an accommodation?
21      A    She has to indicate to me that she has a
22  disability whereby she is requesting, or seeking rather,
23  an ADA -- and accommodation, which she did not.
24      Q    So it's your understanding that in order to be
25  accommodated an employee has to use the words, I am

1  seeking an accommodation?

2     A   No.

3     Q   Okay.  What is your understanding?

4     A   My understanding is that at no point did Tiana indicate that she had a condition where she was disabled and was seeking an accommodation for that disability.

7     Q   How is that different from what I just said? Well, let me ask you another question.

       She gave you the form.  It's from a physician.  It says she is suffering from migraines and will have to be out intermittently.

       Did it occur to you that this might be a situation where the ADA coordinator should be brought in?

14    A   No.

15    Q   Did it even occur to you?

16    A   No.

17    Q   So it's not as if you considered it and rejected it.  It just didn't occur to you?

19    A   I can restate my answer from previously.  At no point did Tiana indicate that she had a disability where she was seeking an accommodation.

22    Q   But you had the form that gave you notice that she --

24    A   She had a chronic --

25    Q   -- had migraine headaches?

Case 3:02-cv-02264-AVC   Document 29-7   Filed 08/06/2004   Page 16 of 17

63

```
 1  chronic migraines; correct?
 2      A    Correct.
 3      Q    And, in fact, you had no prior indication
 4  previous to plaintiff's accumulation of five absences that
 5  these five absences were due to migraines or a chronic
 6  medical condition; isn't that correct?
 7      A    That's correct.
 8      Q    And what I want you to do now is take a look
 9  at what has been marked as Exhibit 11 from yesterday's
10  deposition.  That was during Carol Scherer's testimony.
11           On the bottom of the page, and this is all,
12  from what I understand, her notes at the bottom of the
13  page?
14      A    (Witness indicating.)
15      Q    Michele's notes, sorry.  Take that back.  At
16  the bottom of the page it indicates absences by date;
17  correct?
18      A    Yes.
19      Q    And it says August to October '01; correct?
20      A    Correct.
21      Q    On August 31st what is indicated as a reason
22  for the plaintiff being absent?
23      A    Flu.
24      Q    On September 6th what is the reason as
25  indicated for plaintiff being absent?
```

ALLAN REPORTING SERVICE (860) 658-0500
49 LONG VIEW DRIVE, SIMSBURY, CT  06070-2643

1    A    Food poisoning.

2    Q    On 9-7 what is indicated as to why plaintiff
3    was absent?

4    A    Medical appointment.

5    Q    On 9-17 what's indicated as to why plaintiff
6    was absent?

7    A    Personal problem.

8    Q    On 9-26, I believe, what is indicated as the
9    reason why plaintiff was absent?

10    A    Medical appointment.

11    Q    On 10-25 to 10-26 what's indicated as
12    plaintiff's reason for being absent?

13    A    Migraine.

14    Q    So up until October 25th to October 26th,
15    that's the first indication that plaintiff indicates the
16    reason for her being absent is migraines; correct?

17    A    Correct.

18    Q    And you had no prior knowledge on that -- on
19    September 26th when she came to your office to inquire
20    about how she can get those five occasions reduced to one
21    occasion?

22    A    I had no knowledge of that.

23    Q    When, again, did plaintiff ask for a medical
24    certification form, the date, if you recall?

25    A    I believe it was September 26th.