COPY

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIANA ARMSTRONG | : | Civil Action No. |
| | : | 3:02CV2264 (AVC) |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPARTMENT OF SOCIAL | : | |
| SERVICES | : | June 9, 2004 |

DEPOSITION OF MICHELE FARIERI

BARBARA C. LETSON
Licensed Shorthand Reporter
49 Long View Drive
Simsbury, Connecticut  06070
(860) 658-0500
FAX (860) 658-1199

EXHIBIT NO. 4

```
 1    M I C H E L E   F A R I E R I,

 2

 3              a Witness herein, having

 4              been first duly cautioned and

 5              sworn by Barbara C. Letson, a

 6              Notary Public commissioned and

 7              qualified within and for the

 8              State of Connecticut, deposed

 9              and testified as follows:

10

11    DIRECT EXAMINATION BY MS. GARDNER:

12        Q    Good morning, Ms. Farieri.  Am I pronouncing
13    your name right?
14        A    Uh-huh.
15        Q    We are here this morning to take your
16    deposition.  I'm Barbara Gardner and I represent Tiana
17    Armstrong, who is the plaintiff in this action that's been
18    brought against the DSS and others.  And have you had your
19    deposition taken before?
20        A    No.
21        Q    I will go over a few of the ground rules just
22    so we are clear about that.  I will be asking you a series
23    of questions to which you should respond verbally.  The
24    reporter can't take down nods of the head or uh-huh and
25    things like that.  And if you need to be reminded of that,
```

```
 1   testified to; is that right?
 2        A    Yes.
 3        Q    What was the purpose of that meeting?
 4        A    It was an informal counseling meeting
 5   subsequent to a fifth occasion of absence.
 6        Q    And were you following some procedure or the
 7   collective bargaining agreement or some other document
 8   with respect to having a meeting on the fifth occasion of
 9   absence?
10        A    Yes.
11        Q    And which document were you following?
12        A    Agency time-and-attendance policy.
13        Q    Okay.  Before I mark this I will just ask you,
14   is this what you're referring to?
15        A    It may be.
16        Q    When you say "it may be," is there some other
17   form than this that you might recognize more easily?
18        A    Perhaps.
19        Q    Okay.  Is there another form that you are
20   thinking of?  I'm just trying to understand why you say
21   "may."  You're just not sure that this is the document
22   that you were relying on in 2001?
23        A    That's correct.
24        Q    Okay.  Now, the document that you were relying
25   on in 2001, what did it require, if you know, without
```

```
 1   reviewing the document in terms of informal counseling or
 2   formal counseling?
 3        A    Subsequent to the fifth occasion of absence,
 4   the employee is informally counseled and issued a letter.
 5        Q    Okay.  So the meeting you had on October 5,
 6   2001, was an informal counseling session; is that right?
 7        A    Yes.
 8        Q    And did you issue a letter following that
 9   meeting?
10        A    A letter was issued.  I did not issue the
11   letter.
12        Q    Okay.  Who did?
13        A    Carol Scherer.
14        Q    Okay.  Have you seen a copy of that letter?
15        A    I have.
16        Q    Okay.  Just going to show you what's been
17   marked Exhibit 10 with yesterday's date.  Is this the
18   letter that you're referring to?
19        A    Yes.
20        Q    Okay.  What was said at that meeting as best
21   you can recall, or if you need to review your notes,
22   that's fine.
23        A    During that meeting, the attendance policy was
24   reissued.  Tiana was advised of her occasions of absence.
25   The policy was reviewed, the highlights discussed, the
```

1  letter provided to her.  And she was also advised of the
2  accessibility of the Employee Assistance Program should
3  she need it.  Materials to that end were given to her.
4  There was a discussion regarding the importance of
5  attendance, the number of occasions to date.  She was
6  asked if she understood the policy and her
7  responsibilities.  She said she understood.  She said it
8  would not happen again.  She was asked if she had anything
9  else to discuss, and she said she had another matter to
10 discuss and she wanted to talk to me privately.
11      Q    Okay.  And at that point did Carol Scherer
12 leave?
13      A    Yes.
14      Q    Okay.  And then what did Tiana discuss with
15 you?
16      A    Tiana asked me if she would be eligible for
17 more money, a CCT position.  She advised me that she had
18 been hired at the SST level, that all others in core,
19 except for another individual, were hired at the CCT
20 level.  I referred her to human resources, Jean Anderson.
21      Q    Okay.  At that point, when Tiana asked you
22 about that issue, had you been made aware that despite her
23 having a college degree Tiana and at least one other
24 individual in the regional office were hired as SSTs?
25      A    I don't think so.

```
 1   trying to avoid hiring someone off the SEBAC list as the
 2   reason why she was hired --
 3        A    No.
 4        Q    -- as an SST?
 5        A    No.
 6        Q    Do you know about that issue as you sit here
 7   today?
 8        A    Yes.
 9        Q    Okay.  When was the first time you learned
10   about that?
11        A    Yesterday.
12        Q    Okay.  Did Tiana say anything else other than
13   what's in your notes here on October 5th?
14        A    Not that I recall.
15        Q    Did she tell you that she was uncomfortable or
16   felt like she was being set up, or words to that effect?
17        A    Not that I recall.
18        Q    Do you know if she ever went to speak to Jean
19   Anderson about the SST/CCT issue?
20        A    I don't know.
21        Q    Did you have any problem with the fact that
22   Tiana had raised it with you in the context of this
23   meeting on October 5th, it being the SST/CCT issue?
24        A    Could you be more specific by what you mean by
25   "problem"?
```

```
 1        Q    When she asked about it, were you offended?
 2   Did you think it was inappropriate?
 3        A    No, I did not think it was inappropriate.
 4   However, it's not something that I was familiar with.
 5        Q    Okay.
 6        A    I don't have that area of expertise.
 7        Q    And that's why you referred her to Jean
 8   Anderson?
 9        A    That's correct.
10        Q    Do you know why you followed up with Lisa
11   Owens and/or Jean Anderson?
12        A    I followed up in order to have a better
13   understanding of Tiana, of Tiana's concern.
14        Q    Okay. Was Tiana offered union representation
15   at that meeting on October 5th?
16        A    I don't know.
17        Q    If she were going to be offered
18   representation, would you have had some part in that, in
19   contacting the union rep or telling Tiana that she was
20   entitled to one?
21        A    No.
22        Q    Who is responsible? Would that have been --
23        A    It's my understanding it's the supervisor's
24   responsibility. However, Tiana was not a permanent
25   employee. The right to representation is afforded to
```

```
 1   permanent employees.
 2        Q    Okay.  And what is the source of that
 3   information?
 4        A    I believe that that information was provided
 5   to me by human resources at an earlier point in time
 6   unrelated to Tiana.
 7        Q    Okay.  Going to show you what's been marked
 8   Exhibit 11 at yesterday's deposition.  Do you recognize
 9   that document?
10        A    (Pause.)  Yes.
11        Q    Is that your handwriting on the bottom of that
12   document?
13        A    Under the line which is "absences by date,"
14   yes.
15        Q    Okay.  And did you make those notes on
16   October 5th, if you know?
17        A    I would have no idea.
18        Q    Okay.  When have you seen this document
19   before?
20        A    I believe I saw it when Carol Scherer
21   initially gave it to me, and that's how I made notations
22   on the bottom of it.
23        Q    Okay.  So Carol actually gave you a copy of
24   her notes and you made notes on those notes.  Okay.
25        A    Yes.
```

1    Q    Okay.

2    A    That's the document that I referred to
3  earlier.

4    Q    Okay.  But whatever was given to her on
5  October 5th, the guideline, the policy, I don't want to
6  call it the wrong thing, she was given something else
7  besides Exhibit 10; is that right?

8    A    She was given a copy of the agency
9  attendance-and-tardiness policy.  She was also given a
10 copy of the information regarding the Employee Assistance
11 Program, services available to her through that Employee
12 Assistance Program.

13   Q    And --

14   A    And she was given a copy of what you have
15 referred to as Exhibit 10.

16   Q    And do you know whether the agency
17 attendance-and-tardiness policy addressed under what
18 circumstances an employee could be terminated for
19 absenteeism?

20   A    I don't.

21   Q    Okay.

22   A    If you would like, I'll review it for you.

23   Q    Oh, you mean what we just marked?

24   A    Uh-huh.

25   Q    That's all right.  In your experience when