UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIANA ARMSTRONG | : | Civil Action No. |
| | : | 3:02CV2264 (AVC) |
| V. | : | |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPARTMENT OF SOCIAL | : | |
| SERVICES | : | June 8, 2004 |

DEPOSITION OF LILY MARSHALL

BARBARA C. LETSON
Licensed Shorthand Reporter
49 Long View Drive
Simsbury, Connecticut 06070
(860) 658-0500
FAX (860) 658-1199

EXHIBIT NO. 5

1  L I L Y   M A R S H A L L,

2

3          a Witness herein, having

4          been first duly cautioned and

5          sworn by Barbara C. Letson, a

6          Notary Public commissioned and

7          qualified within and for the

8          State of Connecticut, deposed

9          and testified as follows:

10

11  DIRECT EXAMINATION BY MS. GARDNER:

12      Q    Good morning, Ms. Marshall.

13      A    Good morning.

14      Q    My name is Barbara Gardner and I represent

15  Tiana Armstrong who is the plaintiff in this action that's

16  been brought against the Department of Social Services and

17  others. We are here this morning to take your

18  deposition. Have you been deposed before?

19      A    No, I have not.

20      Q    Okay. I will just go over a few of the ground

21  rules. I'm sure you have talked to your attorney, but

22  we'll just get those on the record so we are clear.

23          I will be asking you a series of questions; if

24  you could wait until I finish my question before you

25  respond. And you need to make all your responses verbal.

```
 1   No nods of the head.  And if you have to be reminded of
 2   that occasionally, that's pretty normal.
 3           If your attorney poses an objection, just hold
 4   your answer until you're instructed what to do.
 5           If at any time you need to take a break, just
 6   tell me and we can do that.
 7           If you don't understand my question, please
 8   tell me that you don't understand and I will rephrase it
 9   so that you do.
10           And I think that's about it.
11           Do you have any questions of me before we
12   begin?
13      A    No, I don't.
14      Q    Okay.  Would you just state your full name.
15      A    Lily M. Marshall, but everyone knows me as
16   Cookie.
17      Q    Okay.  And what is your position at the
18   moment?
19      A    I'm a personnel officer for the Department of
20   Social Services.
21      Q    And how long have you been in that position?
22      A    Thirty-five and a half years.
23           MS. GARDNER:  Off the record.
24           (Off the record.)
25
```

1   building which is revenue services.
2       Q    Okay.  And then what agencies does your
3   personnel office oversee?
4       A    The central office oversees the regional
5   offices within the Department of Social Services.  Each
6   region has a designated personnel unit to oversee the
7   immediate staff in that particular region.
8       Q    Okay.  So did you have responsibility for a
9   certain region?
10      A    No.
11      Q    Okay.
12      A    Central office personnel officers have units
13  within central office that they are responsible for.
14      Q    Okay.  And what unit were you responsible
15  for?
16      A    At the time I oversaw the MIS unit, which is
17  the Management Information Team.  And aside from having
18  that particular unit, I did the administrative division,
19  which would be the deputy commissioner and his secretary.
20  And I was also in charge of all position information.
21      Q    Has your role changed since the fall of 2001?
22      A    Yes, ma'am.  Currently, I am retired effective
23  June 1, 2003, and I'm working as a temporary worker
24  retiree, only working on position accounts.
25      Q    Congratulations.

```
 1         A    Thank you.
 2         Q    So did you have some responsibility over
 3    Tiana's unit or division in the fall of 2001?
 4         A    No.
 5         Q    Okay.  How did you come to meet her when she
 6    was at central office for orientation?
 7         A    I may have been the orientation person at that
 8    time.  Most regions, when they hire employees, they will
 9    come to central office and we had a rotating schedule of
10    personnel officers that will provide the general
11    orientation for each session.  And it may have been my
12    time when I formally met those people that were being
13    hired during that pay period.
14         Q    Okay.  But you don't have any specific
15    recollection whether that was the case?
16         A    I don't remember if I was the orientation
17    person at that time.
18         Q    Okay.  Do you remember the circumstances of
19    your meeting Tiana?
20         A    Other than that moment, yes.  I remember that
21    after the orientation and she had gone back to her
22    original job site, there was some controversy after
23    attending a few of the classes that were required
24    concerning her classification, and I assume that she had
25    inquired within her own region personnel office, but did
```

```
 1   not fully understand the answers that she had received, so
 2   she placed a phone call to my office for more
 3   clarification of the situation.
 4        Q    Okay.  So it's your recollection that Tiana
 5   called you directly and asked you some questions about her
 6   classification?
 7        A    Yes.
 8        Q    And do you remember exactly what she said?
 9        A    Not exactly, but I do know that it was in
10   relation to during their training period she had met other
11   people who had been hired around the same time.  She had
12   been and they had told her that they were at a higher
13   level as Connecticut Careers trainee and because she did
14   have a degree she wondered why she was not at the same
15   level.
16             I told her at that particular time I would
17   have to do some research to find out exactly what the
18   situation was and that I would get back to her.
19        Q    Okay.  Now, before you did the research, did
20   you agree that since she had a degree there was some
21   question about why she wasn't a CCT as opposed to an SST?
22        A    Yes.
23        Q    And so did you have some knowledge of the
24   distinction between those two positions?
25        A    Yes, I did.
```

1       Q       And what was that understanding?

2       A       My understanding is that we have a
3  certification list as provided to us by the Department of
4  Administrative Services.  And when there are primary
5  candidates on the list, we must offer those people the
6  position first.

7       Q       So before you even did any research, you were
8  thinking that that might be why she was an SST?

9       A       Exactly.

10      Q       Now, how often, in your experience at that
11 time, did that happen, that people were hired lower than
12 perhaps they could have been based on their education in
13 order to avoid hiring someone off that list?

14      A       It happened quite a bit, basically, because if
15 we had a hiring goal, which is furnished through to us
16 through the Affirmative Action Division, we try to meet
17 those goals.  And there are some times people on the hire
18 list, which was the Connecticut Career Trainee list, did
19 not meet our goal situation.  Therefore, if we had an
20 opportunity to hire at the lower level, then we would hire
21 that individual.

22              Also, if once the Connecticut Careers Trainee
23 list is cleared, say if there was only one individual on
24 there who was not the hiring goal person, but got picked
25 up by some other agency or some other unit, the person

1    that was hired at the lower level would then be able to be
2    upgraded to the CCT level because there would be no break
3    of the regulations which required us to hire because that
4    list would have been cleared.
5        Q    Okay.  And what did you do after you spoke to
6    Tiana in order to research the situation?
7        A    I looked at the certification list and I
8    noticed that there was one person on there and it was just
9    that one particular person.  And I informed her that
10   because there was this person that's still there, the
11   agency could not, you know, move -- hire her -- and there
12   was another person at the time in the same situation -- we
13   could not bypass the person on the CCT list to make them a
14   CCT person.
15            But once the list was cleared, we could
16   revisit the promotion or the upgrading of her and the
17   other person at that time.
18       Q    Did you make any notes of this research that
19   you did?
20       A    No.
21       Q    Okay.  And you said there were two people who
22   were on the list?
23       A    There were two people in the situation that
24   Tiana was in.
25       Q    Oh.

```
 1        A    Right.
 2        Q    And do you know how you knew that?
 3        A    Because I think during the conversation it may
 4   have come up that, well, I'm not the only one.
 5        Q    Okay.  So you had a conversation with Lisa
 6   Owens?
 7        A    Yes.
 8        Q    Was that before you got back to Tiana, if you
 9   know?
10        A    No.  I believe it was after.
11        Q    Okay.  So after you did this research, then
12   you called Tiana?
13        A    Yeah.
14        Q    Did you ever meet with her personally on this
15   issue or was this all done by phone?
16        A    Basically, by phone.
17        Q    But you do believe that you met her personally
18   during this period of time?
19        A    During the course of the time, yes.
20        Q    Okay.  And did you call her at work to talk to
21   her about this?
22        A    Yes.
23        Q    And what did you say to her?
24        A    Basically, that the reason that she was hired
25   as an SST was because someone else was on the Connecticut
```

1  Careers Training, and I told her that during my
2  questioning of the Department of Administrative Services,
3  once that person was removed or if that person was removed
4  from the Connecticut Careers Training list prior to her
5  reaching her two-year training period, then she could move
6  up to the Connecticut Careers Trainee level.
7      Q   So you didn't tell her that she would
8  immediately be made a CCT and given back pay?
9      A   No.
10     Q   Did you tell her anything like that?
11     A   No.
12     Q   And what did Tiana say, if you remember?
13     A   I'm not sure. I knew, based on the general
14  conversation, that it was -- she was going to pursue it.
15  And I just tried to be supportive and, you know, told her
16  that if she needed to talk about it --
17     Q   Uh-huh.
18     A   Because there was nothing that we could do
19  until that individual was actually moved.
20     Q   Uh-huh. I think I asked you before, how
21  common this was -- and frankly, I can't remember what you
22  said -- how often does this happen?
23     A   It has happened before.
24     Q   Okay.
25     A   It has happened before where we had to hire at

```
 1    sensitive issues?
 2         A    Yes.
 3         Q    And sometimes the person on the SEBAC list
 4    might not be a perfect --
 5         A    Exactly.
 6         Q    Do you know if that analysis was done in this
 7    case with respect to this black gentleman on the SEBAC
 8    list?
 9         A    Yes.
10         Q    Do you know what agency he had worked for
11    before?
12         A    If I'm not mistaken, it may have been Children
13    and Family.
14         Q    Do you know what the circumstances were of his
15    being laid off?
16         A    No.
17         Q    So after you spoke to Tiana I believe you said
18    you spoke to Lisa Owens?
19         A    Yes.
20         Q    Did you call her on the phone?
21         A    Yes.
22         Q    And what did you tell her?
23         A    I told her that I had spoken to Tiana, that
24    she had some questions concerning how she was hired, and
25    she wanted to know what recourses does she have.  And I
```

```
 1   told her I did some research and found out and tried to
 2   explain to her the reason why she was hired at the lower
 3   level and not the higher.
 4        Q    And did you tell Lisa what you just told me,
 5   which is that Tiana said she was going to pursue it?
 6        A    Yes.
 7        Q    Okay.  And --
 8        A    Uh-huh.
 9        Q    -- what did that mean to you, that she was
10   going to pursue it?
11        A    That she was actively going to remain on the
12   situation and, you know, like I told her, she needed to
13   talk to her personnel officers because Lisa could check
14   just as well as I could in regards to making sure that
15   when that person was off the list that Tiana get upgraded
16   to CCT.
17        Q    Okay.  And did you see any problem with her
18   pursuing it in some manner?  Her being Tiana.
19        A    Oh, no.
20        Q    And do you know if Lisa found that to be a
21   problem?
22        A    I wouldn't know.
23        Q    Did she say anything during that conversation
24   that would lead you to believe that she was troubled by
25   that?
```

```
1       A    No.

2       Q    Do you remember what Lisa said when you told

3   her this?

4       A    Just that she would follow up.  That was,

5   basically, the conversation.

6       Q    Okay.  Did you speak to anyone else besides

7   Tiana and Lisa about the situation?

8       A    No.

9       Q    Was that the only conversation you had with

10  Lisa about this issue?

11      A    Yes.

12      Q    Are you familiar with the P 33 medical

13  certificate?

14      A    Yes.

15      Q    And what is the purpose of that medical

16  certificate?

17      A    The P 33(a) form is a doctor's note that we

18  give to employees when they have been out of work for five

19  or more days and is required by law for them to submit a

20  diagnosis written by the doctor on that person's

21  availability to do the job.

22      Q    Okay.  And how is that process started?  Does

23  the agency provide the certificate to the employee?

24      A    Yes, they do.

25      Q    If the employee asked for the certificate,
```

1  Q Okay.

2  A And so I said then, you know, I'll take a look
3 or do some research to see if I can find out what
4 actually's going on.

5  Q But you can't say today for sure whether or
6 not, or can you, she actually contacted her regional
7 personnel --

8  A No, I can't.

9  Q Okay. Just back up a little for myself. I
10 need some clarification regarding the SEBAC list. At the
11 time -- well, let me just back up. We probably went over
12 it, but I was doing other things. What does the SEBAC
13 list provide?

14  A The SEBAC list provides a list of candidates
15 who have been laid off from either a current agency or
16 some other agency.

17  Q Uh-huh. Now, in that scenario, the person
18 that's -- now, this person would be -- okay, that's the
19 laid-off individual?

20  A Right.

21  Q Now, that laid-off individual, that person's
22 eligible for rehire; correct?

23  A Correct.

24  Q Eligible for reemployment. You indicated that
25 there was another person -- that there was a person on the

1   SEBAC list for the SST -- CCT?

2          A    CCT, yes.

3          Q    Now, under the SEBAC rules or under the rules

4   that govern SEBAC, would the plaintiff have been able to

5   get the CCT position because -- get the CCT -- would she

6   have gotten it?

7          A    No.

8          Q    And why is that?

9          A    If they were going strictly with CCT, they

10  would have had to give it to the person regardless to

11  history that was already a CCT, who had already been on

12  the list at that particular title.

13         Q    In that scenario, if you can recall, did DSS

14  exercise their right to hire that individual that was on

15  the SEBAC list?

16         A    That person was contacted and there was some

17  history and that person didn't have the -- we gave that

18  person a skills waiver.

19         Q    Okay.

20         A    Because the person could not perform the

21  duties that we wanted done.

22         Q    Okay.  Skills waiver?

23         A    In other words, we had to submit something or

24  at least speak to someone at the DAS in order to get

25  permission to hire at the lower level.

1    A    And then from there the discussion is made on
2 whether or not, if the person wanted to, you know, come
3 there for the interview and whatever and the person does
4 not match what we need him or her to do, or if there's
5 some background problems or whatever, then we have to tell
6 DAS that, you know, the person is not a fit, so they call
7 that like a skills waiver.
8         In other words, he can't perform the function
9 that we need to be done.  That's why we are moving -- we
10 are going to go with the lower level as opposed to
11 giving -- you know, just not dealing with the person.  We
12 have to give everybody an appropriate opportunity to apply
13 and be interviewed.
14    Q    Do you know if this person applied and --
15    A    No, I wouldn't know.
16    Q    Okay.  He may have been.  You just don't
17 know?
18    A    Right.
19    Q    Because if he applied and was interviewed and
20 didn't get the job, couldn't you then hire outside SEBAC
21 at the CCT level?
22    A    No, because he would still be on the
23 certification list.  In other words, in order to hire at
24 the CCT level, that person would have to be gainfully
25 employed by an agency at which time his name would have

41

1  been removed from the CCT list and then we could move on.

2      Q    Okay. Do you know which region Latonya

3  Jefferson worked at?

4      A    No.

5      Q    Was it the north central region or you

6  don't --

7      A    I don't know.

8          MS. GARDNER:  That's all I have.

9          MS. GEATHERS:  That's it.

11         (The Witness was excused and the

12          deposition concluded at 11:25 a.m.)