## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIANA ARMSTRONG, | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 302CV2264 (AVC) |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPARTMENT OF SOCIAL | : | |
| SERVICES, | : | |
| Defendant | : | September 27, 2004 |

### LOCAL RULE 56(a)2 STATEMENT

1. Admit

2. Admit

3. Admit

4. Admit, with clarification.  Plaintiff was told that she was interviewing for a CCT

position.(Exh. C, Armstrong Affidavit at para. 4)

5. Admit

6. Admit

7. Admit

8. Deny (Armstrong Depo., Exh. A, p. 60: 18-25; 61: 1-10)

9. Deny (Exh. A at 62:13-16; Exh. C at para. 7)

10. Deny that she used leave without pay for a doctor's appointment (Exh. A at 64:21-25; 65:1-

5; Exh. C para. 7). Admit the remainder.

11. Admit she was out for more than one day at that point in her employment, but was only out

on September 17, 2001 that week.

12. Deny (Exh. C at para. 12)

13.  Admit that did not notify her supervisor prior to Sept. 26 that she had an 8:30 doctor's appointment because did not know she would have a migraine and have to make a doctor's appointment and CORE training began at 9:30 so she did not know if she would be late.  When training cancelled, plaintiff did notify her supervisor, early on the morning of the 26th, that she would be late. (Exh. A, p. 69-70, Exh. C at para. 12.)

14.  Deny that plaintiff had five occasions of absence from work on October 5, 2001, and that an informal counseling session was warranted under the Guidelines.  Admit that an informal counseling session was held on that date.(Exh. B, Guidelines for Employee Attendance and Tardiness at 9, Exh. C at 14).

15.  Deny

16.  Admit

17.  Admit

18.  Admit

19.  Admit

20.  Admit, except plaintiff denies saying "it will not happen again."

21.  Deny (Exh. C at para. 15)

22.  Deny (Id)

23.  Admit with Clarification.  Union representation was not mandatory, but the employee had the option of having union representation. (Exh. B, Guidelines at 9)

24.  Admit that plaintiff met with Scherer on October 18, 2001 to discuss breaks. (Exh. C at para. 18.)

25. Admit

26. Deny that October 26 was plaintiff's sixth occasion of absence (Exh. B, Exh. D, Contract between DSS and AFSCME) Admit the remainder.

27. Deny (Exh. C at para. 9)

28. Admit

29. Admit that failure to complete her initial probationary period was the reason given by DSS for plaintiff's termination from employment on November 5, 2001. Deny the remainder. (Exh. C)

30. Deny (Exh. D at 2, Exh. E, Owens depo., p.22:8-10)

31. Admit

32. Admit

33. Deny (Complaint, para. 1-18, 27-31, Exh. B)

34. Deny (*Id.*) Admit second sentence.

35. Admit

36. Admit

37. Admit

38. Admit

39. Deny (Exh. C, para. 5-10, Exh. B, Exh. D)

40. Admit

41. Admit

42. Admit

43. Admit

44. Deny that plaintiff had a "right" to underfill. Admit remainder. (Defendants' 56(a)1

statement #43, Def. Exh. 18 )

45. Deny (*Id.*)

46. Admit

47. Admit

48. Deny that plaintiff had reached her "fifth occasion" of absence on October 5 (Exh. B at 9, Exh. C at para. 14, Exh. D).  Admit remainder.

49. Deny(Exh. C at para. 14-15)

50. Admit that Carol Scherer had no input or involvement in the plaintiff being hired as an SST as opposed to a CCT.  Deny the remainder. (Exh. C at para. 10-22)

51. Admit

52. Deny that Silvana Flattery "not involved" in dropping plaintiff during her working test period. (Exh. F, Interim Service Rating) and that she did not have occasion to speak with Marshall, Jones, Owens, Scherer, or Farieri about the plaintiff. (Exh. G, Flattery depo. at p.7-14) Admit remainder.

53. Admit

54. Admit

55. Admit with clarification.  Plaintiff did not follow up with Owens about the issue regarding her classification as an SST versus CCT. Plaintiff did follow up with Michele Farieri, who contacted Owens and/or Jeanne Anderson about the issue. (Exh. H, Farieri depo. at 15-17)

56. Admit

57. Deny as to Silvana Flattery as to time of hiring.  Deny as to Scherer, Farieri, and Jones as to time of termination.(Exh. G, 7-14, Exh. F, Exh. C)

58.  Deny that plaintiff's race was not a factor in decision to hire her as an SST.(Complaint)

Admit the remainder.

59.  Deny that race or retaliation were not motivating factors in her termination. (*Id*).

60.  Deny(see Exh. C, Exh. B, Exh. D)

61. Admit

62.  Admit

63. Deny (Exh. C at para. 13)

64.  Admit

65.  Admit that plaintiff had not worked 1,250 hours.  Deny the remainder (Exh. E, p. 32)

66.  Admit

67.  Deny (see Exh. C, B, and D)

68.  Admit

## DISPUTED ISSUES OF MATERIAL FACT

1.      Plaintiff's employment was governed by the contract between the State of Connecticut

and AFSCME effective July 1, 1999 ("the Contract")(Exh. D).  Although plaintiff was not a

"permanent employee" as that term is defined in the Contract, she was a nonpermanent employee

appointed to a permanent position.  As the CBA states: "Nonpermanent employees appointed to

permanent positions are covered by this Agreement; this includes employees on initial working

test period who are in permanent positions." (Article One, Section Three, Exh. D at p. 2.; Owen

depo., Exh. E at 22.)  However, as a nonpermanent employee, plaintiff's dismissal during her

initial working test period was not grievable or arbitrable. (Article 11. Section Four. (d), Exh. D

at 19.)  In all other respects, plaintiff was covered by the contract and its terms applied to her

during the working test period. (Exh. E, Owens depo. at 22)

2.      The DSS Guidelines for Employee Attendance and Tardiness ("the Guidelines")(Exh. B) also applied to plaintiff's employment.  By its terms, the Guidelines are designed to "provide DSS staff with uniform guidelines and provide supervisors with processes for addressing attendance issues" (Exh. B at 1, Guidelines).

3.      The portion of the Contract governing sick leave states that in reviewing an employee's record to determine whether a sick leave usage problem exists, the Employer *shall* consider the following factors: (1) the number of days taken, and number of occasions; (2) patterns of usage; (3) the employee's past record; (4) the reasons for sick leave use; (5) *extenuating circumstances*. Article 29. Section Four (a). (emphasis added), Exh. (D at 52.)

4.      An "occasion of sick leave" is defined as "any one continuous period of unscheduled absence for the same reasons." (Article 29. Section Four (b), *Id.*at 53.)  "For the purpose of preparing service ratings, the number of sick time occasions shall not be considered in isolation; rather, the entire attendance record shall be considered, including those factors specified in (a) above." Id.

5.      A "medical certificate", also known as Form 33, signed by a doctor, is required of an employee to substantiate a request for sick leave for... leave of any duration if absence from duty occurs frequently or habitually provided the employee has been notified that a certificate will be required. Exh. D, Id.

6.      The Guidelines provide in relevant part that "sporadic unscheduled periods of absence for the same reason may or may not be considered as separate occasions.  In making this determination the circumstances and/or documentation regarding the reason for the absences

6

*must* be taken into consideration."(emphasis added)( Exh. B at 2.)

7.      The preamble to the corrective actions states that "final judgment on a remedial course of action should not be made until all relevant information has been carefully evaluated and weighed." (Exh. B at 7.)  As to chronic medical conditions, the Guidelines state that "discussions *should* occur between the Supervisor, Manager, HR representative and ADA Coordinator regarding options for consideration. Id.

8.      On August 31, 2001, plaintiff called in sick because she had a migraine headache.  Rather than reporting that she had a "migraine" she told her supervisor, Carol Scherer, her symptoms and said she was sick.  She never told Ms. Scherer that she had "the flu." (Exh. C at para. 5)

9.      On September 6 for one half day and for one and one half hours on September  7, 2001, plaintiff was out of work with food poisoning.  She notified her supervisor.(Id at 7)  On September 17, 2001, plaintiff was again out of work because of a migraine.  She left several messages for her supervisor and a number where she could be reached as is required by the Guidelines (Exh. B at 4.)  Although she did not specify to her supervisor the reason for her absence in the first message, as she did not wish to leave confidential medical information on an answering machine, she did say that she was not feeling well in the second message and again left a phone number.  (Exh. A, Armstrong depo. at p. 66-68; Exh. C at para. 8)

10.     On September 20, 2001, plaintiff met with Ms. Scherer and advised her that she suffered from migraine headaches.  She asked whether or not she should have this documented in some way and Ms. Scherer said no.  (Exh. C at para. 9; Exh. I, Scherer Notes)

11.     On September 26, 2001, plaintiff was not feeling well and scheduled a doctor's appointment at 8:30 a.m.  During this time she was attending Curricula for Orientation,

Reinforcement and Enrichment training (CORE), which was scheduled to begin at 9:30 a.m. At the last minute, CORE training was cancelled for the day. Plaintiff then notified her supervisor, early on the morning of the 26th, that she would be late because she was not feeling well and had a doctor's appointment. (Armstrong depo at 69-70) (Exh. C at para. 12) Plaintiff is only required to notify her supervisor "within thirty minutes after the scheduled start time" to request authorization for an unscheduled absence. (Exh. B at p. 4)

12.    When plaintiff came in later that day she stopped at Human Resources to consult with Lisa Owens, Personnel Officer. She advised Owens that she had a chronic medical condition, specifically migraines, and asked if there was anything she should do to document her condition, which was causing her absences. (Armstrong depo at 81-84; Exh. C at para. 13) On that date, Owens provided plaintiff with a P33 medical certificate to be completed by plaintiff's doctor.

13.    On October 12, 2001, plaintiff's doctor completed the medical certificate confirming that her absences on August 31 and September 17 and 26 were due to migraines.(Exh. C at para. 16)

14.    During the time plaintiff attended CORE training she became aware that she, who was African American, and another woman, who was Hispanic, had been hired as SSTs despite having college degrees, while other nonminorities hired at the same time had been hired as CCTs. Plaintiff went to speak with Lily "Cookie" Marshall, who was a personnel officer in the Central Office, and inquired as to plaintiff's status as an SST. Plaintiff pointed out that she believed that she and perhaps her colleague, who was Hispanic, had been discriminated against because of their race when they were hired as SSTs and not CCTs.(Exh. C at para. 10, 11; Exh. J, Marshall depo at 14.) Based on plaintiff's observations during training classes, some of the CCTs hired at the same time as she were minorities, but all of the SSTs with college degrees

8

were minorities and employed in the North Central Region. (Exh. C at 10)

15.     After reviewing the situation, Ms. Marshall reported back to plaintiff that she could not

be hired at the higher level despite her college degree because the state was avoiding hiring a

black male off the SEBAC list.( Exh. J at 12, Exh. N, #13)  In other words, in order to hire

plaintiff as a CCT in the North Central Region of DSS, the SEBAC regulations would have

required that the black male be given preference for a CCT position. (Id. at 13-14.)

16.     Lisa Owens testified that it was her decision not to interview the individual from the

SEBAC list and "underfill" the position. (Exh. E at 14-15)

17.     Cookie Marshall advised Lisa Owens of plaintiff's complaint.  She told Owens that

plaintiff asked what "recourse" would she have on the SST issue and advised Owens that

plaintiff would be following up with her.(Exh. J at 19)  Ms. Owens testified that she may have

told Jean Anderson, the Principle Personnel Officer at the time, who reported to Silvana Flattery,

Operations Manager. (Exh. E at 21; Exh. G at 8-9.)

18.     On October 5, 2001, plaintiff was called into an informal counseling session with Carol

Scherer, her supervisor, and Michele Farieri, Field Operations Manager, and counseled on her

attendance.  Prior to the meeting Lisa Owens spoke with Carol Scherer and advised her to

"follow the outlines in the attendance policy"(the Guidelines, Exh. B) in monitoring plaintiff's

attendance. (Exh. E at 23:19-23)

19.     In accordance with the Contract, plaintiff had at the most "four occasions" of absence on

October 5, 2001.  Specifically, the food poisoning would qualify as one occasion, and the other

absences, although all for migraines, would qualify as separate occasions because plaintiff had

not yet returned the P33, which might have allowed her absences for migraines to count as one

occasion.

20.    Plaintiff was not provided with union representation at the Oct. 5th meeting, which is required by the Guidelines (Exh. B at 9).  Moreover, the meeting was premature as plaintiff had not yet accrued five absences.(Id, Exh. C)

21.    After Ms. Scherer left the meeting, Ms. Armstrong met with Ms. Farieri alone to discuss two issues.  First, Ms. Armstrong advised Ms. Farieri that she had migraines and was concerned that her absenteeism from the migraines would affect her employment.  Ms. Farieri referred her to Lisa Owens.  Second, plaintiff inquired about her status as an SST when others with college degrees were hired as CCTs.  She wondered when she might be eligible for a CCT position.  Ms. Farieri referred plaintiff to Human Resources.  Ms. Farieri testified that she then called Lisa Owens and either Owens or Jeanne Anderson, Principle Personnel Officer, called her back and informed her that Tiana had accepted the SST position.  No further explanation was given. (Exh. H at 17; Exh. C at para. 15)

22.    At some point after returning from CORE training on or about October 12, 2001, plaintiff called Cookie Marshall and told her that she felt that she was being "set up" by her supervisor for termination.  She felt that she was being treated differently since returning from CORE training.  Plaintiff wondered if it had something to do with the questions she had been asking about being hired as an SST rather than a CCT and whether or not it was discriminatory.  During that same conversation, plaintiff discussed her medical condition with Cookie Marshall, specifically the fact that she suffered from migraine headaches.  Ms. Marshall advised plaintiff to have her doctor document the medical condition.  Ms. Marshall testified that if a medical condition is documented, DSS could consider several absences for the same reason as one occasion even

10

retroactively. (Exh. J at 21-22; Exh. C at para. 17).

23.     On October 18, 2001, plaintiff asked to meet with Michele Farieri, after being reprimanded by Carol Scherer for taking her morning break too late.  Ms. Farieri met with plaintiff on October 19 and plaintiff told her that she felt she was being "set up" for termination by Ms. Farieri perhaps because she had been complaining about her status as an SST and the appearance of discrimination.  Plaintiff told Ms. Farieri that Ms. Scherer had been ignoring her, had not set up her voice mail or e-mail, and was not training plaintiff.  Plaintiff said there was a distinct difference in how Ms. Scherer was treating her as opposed to others and in the treatment she received before and after CORE training. (Exh. C at para. 18)

24.     Ms. Armstrong was out of work on October 25 and 26 with a migraine.  Thereafter Ms. Armstrong had her doctor update the medical certificate confirming that her absences on October 25 and 26 were due to migraines. (Defendants' Exh. 33) She delivered the completed certificate to Lisa Owens secretary on October 29, 2001.  Plaintiff had made several attempts since mid October to make an appointment to see Lisa Owens in person to deliver the certificate but was unable to do so because, according to Owens, she was too busy.(Exh. C at para. 19; Exh. E at 35.)

26.     On November 5, 2001, plaintiff was called into a meeting and handed an unsatisfactory service rating based on her attendance.  This was the first time that she had seen the service rating.  Plaintiff was immediately terminated .(Exh. C at 20)

27.     The Guidelines provide that after the fifth occasion of absence you get informal counseling; after the seventh occasion you get a written warning; nine occasions is grounds for an unsatisfactory service rating, and additional occasions beyond nine is grounds for termination.

(Exh. B at 9)  Specifically, the Guidelines state "if the *first* service rating results in an unsatisfactory rating in attendance, the employee's failure to correct the attendance problem will result in a *second* unsatisfactory service rating, which is considered grounds for dismissal from State service." (Exh. B at 14) An unsatisfactory service rating based on attendance is not warranted until there have been nine occasions of absence (Exh. B at 9) A reasonable interpretation of this language is that the first service rating indicating unsatisfactory in attendance is *not* grounds for dismissal.

28.    Both Cookie Marshall and Rudolph Jones concurred with this stating that the purpose of the service rating was to give the employee time to improve. (Exh. J at 24, 27; Exh. K at 19). Rudolph Jones stated that he would "look askance" at an employee being given an unsatisfactory service rating and being terminated in the same day, as occurred here. (Exh. K at 19-21.)

29.    Ms. Scherer testified that she was told to prepare the unsatisfactory rating for the purpose of dismissal by either Lisa Owens or Michele Farieri. (Exh. L, depo. of Scherer at 26-27)  She further testified that in nineteen years of employment she had never prepared a service rating for dismissal. Ms. Scherer was advised to begin preparation of the service rating on or about October 19, 2001, (Exh. L at 27) the very day that plaintiff spoke with Ms. Farieri about being "set up" for dismissal.

30.    Ms. Scherer had drafted a service rating and forwarded it to Ms. Farieri and Ms. Owens on the afternoon of October 26, 2001, which was a Friday. (Exh. M, Draft Service Rating) Although the service rating prepared by Ms. Scherer rated plaintiff "good" in the category of "judgment", Ms. Owens or Ms. Farieri advised her to change this category to "less than good."(Exh. L, Scherer depo at 36-38) in order to bolster the cause for termination, even though

12

they did not have direct knowledge of Tiana's performance with regard to judgment.

31.    On October 29, 2001, prior to plaintiff's termination, DSS was in possession of plaintiff's

medical certificate. (Exh. C at 19) In accordance with the Contract and Guidelines, DSS should

The Contract and Guidelines require that DSS consider plaintiff's documented medical condition prior to

have considered this information prior to terminating plaintiff's employment. (Exhibit D ¶ 32)

terminating her employment.  Plaintiff's eligibility for the  Family Medical Leave Act has no

bearing on this requirement.

33.    Plaintiff was terminated on November 5, 2001 after, at most, five occasions of absence

with no consideration of her medically documented chronic condition of migraine

headaches.(Exh. E at 46, 56)

THE PLAINTIFF, TIANA ARMSTRONG

_____

Barbara E. Gardner
CT07623
843 Main St., Suite 1-4
Manchester, CT 06040
(860)643-5543
(860)645-9554(fax)
Bg@bgardnerlaw.com

13

**CERTIFICATION OF SERVICE**

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this [27th] day of
Septemberl, 2004, to:

Tammy D. Geathers
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

_____
Barbara E. Gardner

14