## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIANA ARMSTRONG, | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 302CV2264 (AVC) |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPARTMENT OF SOCIAL | : | |
| SERVICES, ET AL. | : | |
| Defendants | : | September 27, 2004 |

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

Plaintiff hereby submits this Memorandum opposing Defendants' Motion for Summary Judgment. Plaintiff further relies on the attached Affidavits and Exhibits. Plaintiff concedes that judgment should be entered in favor of Defendant DSS on plaintiff's counts under the Connecticut Fair Employment Practices Act. For the reasons set forth below, plaintiff opposes summary judgment on the remaining counts under 42 U.S.C. §1983 and Title VII.

There are numerous issues of material fact in dispute and summary judgment is not warranted. Plaintiff alleges race discrimination because she was hired at a lower level than other similarly situated employees with college degrees. Defendant has not put forth a legitimate business reason for this action. Plaintiff alleges retaliation for having complained of 1) race discrimination and 2)retaliation. Defendants did not follow their uniform procedures or the collective bargaining agreement in terminating plaintiff's employment for alleged absenteeism,

thereby raising an issue of fact as to pretext.  Plaintiff was terminated within weeks of engaging in protected activity.

## II.  MATERIAL FACTS

Tiana Armstrong began working for defendant State of Connecticut, Department of Social Services ("DSS") on August 17, 2001 as a Social Services Trainee (SST) with a targeted class of Eligibility Services Worker.  She held a Bachelor's Degree at the time she was hired. According to the job description, applicants having college degrees are eligible to be hired as Connecticut Careers Trainees (CCT).  As a CCT, plaintiff would have earned a higher salary and had a shorter training period.(Defendants' Exh. 14)

Plaintiff's employment was governed by the contract between the State of Connecticut and AFSCME effective July 1, 1999 ("the Contract")(Exh. D).  Although plaintiff was not a "permanent employee" as that term is defined in the Contract, she was a nonpermanent employee appointed to a permanent position.  As the CBA states: "Nonpermanent employees appointed to permanent positions are covered by this Agreement; this includes employees on initial working test period who are in permanent positions." (Article One, Section Three, Exh. D at p. 2.; Owen depo., Exh. E at 22.)  However, as a nonpermanent employee, plaintiff's dismissal during her initial working test period was not grievable or arbitrable. (Article 11. Section Four. (d), Exh. D at 19.)  In all other respects, plaintiff was covered by the contract and its terms applied to her during the working test period. (Exh. E, Owens depo. at 22)

The DSS Guidelines for Employee Attendance and Tardiness ("the Guidelines")(Exh. B) also applied to plaintiff's employment. By its terms, the Guidelines are designed to "provide DSS staff with uniform guidelines and provide supervisors with processes for addressing attendance issues" (Exh. B at 1, Guidelines).

The portion of the Contract governing sick leave states that in reviewing an employee's record to determine whether a sick leave usage problem exists, the Employer *shall* consider the following factors: (1) the number of days taken, and number of occasions; (2) patterns of usage; (3) the employee's past record; (4) the reasons for sick leave use; (5) *extenuating circumstances*. Article 29. Section Four (a). (emphasis added), Exh. (D at 52.) An "occasion of sick leave" is defined as "any one continuous period of unscheduled absence for the same reasons." (Article 29. Section Four (b), *Id*.at 53.) "For the purpose of preparing service ratings, the number of sick time occasions shall not be considered in isolation; rather, the entire attendance record shall be considered, including those factors specified in (a) above." Id.

A "medical certificate", also known as Form 33, signed by a doctor, is required of an employee to substantiate a request for sick leave for... leave of any duration if absence from duty occurs frequently or habitually provided the employee has been notified that a certificate will be required. Exh. D, Id.

The Guidelines provide in relevant part that "sporadic unscheduled periods of absence for the same reason may or may not be considered as separate occasions. In making this

determination the circumstances and/or documentation regarding the reason for the absences *must* be taken into consideration."(emphasis added)( Exh. B at 2.)  Under the heading of "Standards for Attendance Review" the Guidelines set forth a schedule of corrective actions depending on the number of absences.  It is noteworthy that the preamble to the corrective actions states that "final judgment on a remedial course of action should not be made until all relevant information has been carefully evaluated and weighed." (Exh. B at 7.)  As to chronic medical conditions, the Guidelines state that "discussions *should* occur between the Supervisor, Manager, HR representative and ADA Coordinator regarding options for consideration. Id.

On August 31, 2001, plaintiff called in sick because she had a migraine headache.  Rather than reporting that she had a "migraine" she told her supervisor, Carol Scherer, her symptoms and said she was sick.  She never told Ms. Scherer that she had "the flu." (Exh. C at para. 5)  On September 6 for one half day and for one and one half hours on September 7, 2001, plaintiff was out of work with food poisoning.  She notified her supervisor.(Id at 7)  On September 17, 2001, plaintiff was again out of work because of a migraine.  She left several messages for her supervisor and a number where she could be reached as is required by the Guidelines (Exh. B at 4.)  Although she did not specify to her supervisor the reason for her absence in the first message, as she did not wish to leave confidential medical information on an answering machine, she did say that she was not feeling well in the second message and again left a phone number. (Armstrong depo.p. 66-68; Exh. C at para. 8)

4

On September 20, 2001, plaintiff met with Ms. Scherer and advised her that she suffered from migraine headaches.  She asked whether or not she should have this documented in some way and Ms. Scherer said no.  (Exh. C at para. 9; Exh. I, Scherer Notes)

On September 26, 2001, plaintiff was not feeling well and scheduled a doctor's appointment at 8:30 a.m.  During this time she was attending Curricula for Orientation, Reinforcement and Enrichment training (CORE), which was scheduled to begin at 9:30 a.m.  At the last minute, CORE training was cancelled for the day.  Plaintiff then notified her supervisor, early on the morning of the 26th, that she would be late because she was not feeling well and had a doctor's appointment. (Armstrong depo at 69-70) (Exh. C at para. 12) Plaintiff is only required to notify her supervisor "within thirty minutes after the scheduled start time" to request authorization for an unscheduled absence. (Exh. B at p. 4)When plaintiff came in later that day she stopped at Human Resources to consult with Lisa Owens, Personnel Officer.  She advised Owens that she had a chronic medical condition, specifically migraines, and asked if there was anything she should do to document her condition, which was causing her absences. (Armstrong depo at 81-84; Exh. C at para. 13)  On that date, Owens provided plaintiff with a P33 medical certificate to be completed by plaintiff's doctor.  On October 12, 2001, plaintiff's doctor completed the medical certificate confirming that her absences on August 31 and September 17 and 26 were due to migraines.(Exh. C at para. 16)

During the time plaintiff attended CORE training she became aware that she, who was

African American, and two other women, one Hispanic (Jazmin Molina) and one African American (Helena Marshall), had been hired as SSTs despite having college degrees, while other nonminorities hired at the same time had been hired as CCTs.  The other common element was that plaintiff and these two women were employed in the North Central Region, under the administration of Silvana Flattery. (Exh. G at 5; Exh N, #7)  Plaintiff went to speak with Lily "Cookie" Marshall, who was a personnel officer in the Central Office, and inquired as to plaintiff's status as an SST.  Plaintiff pointed out that she believed that she and perhaps her colleagues, who were also minorities, had been discriminated against because of their race when they were hired as SSTs and not CCTs.(Exh. C at para. 10, 11; Exh. J, Marshall depo at 14.) After reviewing the situation, Ms. Marshall reported back to plaintiff that she could not be hired at the higher level despite her college degree because the state was avoiding hiring a black male off the SEBAC list.( Id. at 12)  In other words, in order to hire plaintiff as a CCT in the North Central Region of DSS, the SEBAC regulations would have required that the black male be given preference for a CCT position. (Id. at 13-14.)  Lisa Owens testified that it was her decision not to interview the individual from the SEBAC list and "underfill" the position. (Exh. E at 14-15)  Cookie Marshall advised Lisa Owens of plaintiff's complaint.  She told Owens that plaintiff asked what "recourse" would she have on the SST issue and advised Owens that plaintiff would be following up with her.(Exh. J at 19)  Ms. Owens testified that she may have told Jean Anderson, the Principle Personnel Officer at the time, who reported to Silvana Flattery,

6

Operations Manager. (Exh. E at 21; Exh. G at 8-9.)

On October 5, 2001, plaintiff was called into an informal counseling session with Carol Scherer, her supervisor, and Michele Farieri, Field Operations Manager, and counseled on her attendance. Prior to the meeting Lisa Owens spoke with Carol Scherer and advised her to "follow the outlines in the attendance policy"(the Guidelines, Exh. B) in monitoring plaintiff's attendance. (Exh. E at 23:19-23) In accordance with the Contract, plaintiff had at the most "four occasions" of absence at that time. Specifically, the food poisoning would qualify as one occasion, and the other absences, although all for migraines, would qualify as separate occasions because plaintiff had not yet returned the P33, which might have allowed her absences for migraines to count as one occasion. Plaintiff was not provided with union representation at this meeting, which is required by the Guidelines (Exh. B at 9). Moreover, the meeting was premature as plaintiff had not yet accrued five absences.(Id, Exh. C)

After Ms. Scherer left the meeting, Ms. Armstrong met with Ms. Farieri alone to discuss two issues. First, Ms. Armstrong advised Ms. Farieri that she had migraines and was concerned that her absenteeism from the migraines would affect her employment. Ms. Farieri referred her to Lisa Owens. Second, plaintiff inquired about her status as an SST when others with college degrees were hired as CCTs. She wondered when she might be eligible for a CCT position. Ms. Farieri referred plaintiff to Human Resources. Ms. Farieri testified that she then called Lisa Owens and either Owens or Jeanne Anderson, Principle Personnel Officer, called her back and

7

informed her that Tiana had accepted the SST position.  No further explanation was given. (Exh. H at 17; Exh. C at para. 15)

At some point after returning from CORE training on or about October 12, 2001, plaintiff called Cookie Marshall and told her that she felt that she was being "set up" by her supervisor for termination.  She felt that she was being treated differently since returning from CORE training.  Plaintiff wondered if it had something to do with the questions she had been asking about being hired as an SST rather than a CCT and whether or not it was discriminatory.  During that same conversation, plaintiff discussed her medical condition with Cookie Marshall, specifically the fact that she suffered from migraine headaches.  Ms. Marshall advised plaintiff to have her doctor document the medical condition.  Ms. Marshall testified that if a medical condition is documented, DSS could consider several absences for the same reason as one occasion even retroactively. (Exh. J at 21-22; Exh. C at para. 17).

On October 18, 2001, plaintiff asked to meet with Michele Farieri, after being reprimanded by Carol Scherer for taking her morning break too late.  Ms. Farieri met with plaintiff on October 19 and plaintiff told her that she felt she was being "set up" for termination by Ms. Scherer perhaps because she had been complaining about her status as an SST and the appearance of discrimination.  Plaintiff told Ms. Farieri that Ms. Scherer had been ignoring her, had not set up her voice mail or e-mail, and was not training plaintiff.  Plaintiff said there was a distinct difference in how Ms. Scherer was treating her as opposed to others and in the treatment

8

she received before and after CORE training. (Exh. C at para. 18)

Ms. Armstrong was out of work on October 25 and 26 with a migraine. Thereafter Ms. Armstrong had her doctor update the medical certificate confirming that her absences on October 25 and 26 were due to migraines. (Defendants' Exh. 33) She delivered the completed certificate to Lisa Owens secretary on October 29, 2001. Plaintiff had made several attempts since mid October to make an appointment to see Lisa Owens in person to deliver the certificate but was unable to do so because, according to Owens, she was too busy.(Exh. C at para. 19; Exh. E at 35.)

On November 5, 2001, plaintiff was called into a meeting and handed an unsatisfactory service rating based on her attendance. This was the first time that she had seen the service rating. Plaintiff was immediately terminated .(Exh. C at 20)

The Guidelines provide that after the fifth occasion of absence an employee gets informal counseling; after the seventh occasion an employee gets a written warning; nine occasions is grounds for an unsatisfactory service rating, and additional occasions beyond nine is grounds for termination. (Exh. B at 9) Specifically, the Guidelines state "if the *first* service rating results in an unsatisfactory rating in attendance, the employee's failure to correct the attendance problem will result in a *second* unsatisfactory service rating, which is considered grounds for dismissal from State service." (Exh. B at 14) An unsatisfactory service rating based on attendance is not warranted until there have been nine occasions of absence (Exh. B at 9) A reasonable

9

interpretation of this language is that the first service rating indicating unsatisfactory in attendance is *not* grounds for dismissal.  Both Cookie Marshall and Rudolph Jones concurred with this stating that the purpose of the service rating was to give the employee time to improve. (Exh. J at 24, 27; Exh. K at 19). Rudolph Jones stated that he would "look askance" at an employee being given an unsatisfactory service rating and being terminated in the same day, as occurred here. (Exh. K at 19-21.)

Ms. Scherer testified that she was told to prepare the unsatisfactory rating for the purpose of dismissal by either Lisa Owens or Michele Farieri. (Exh. L, depo. of Scherer at 26-27)  She further testified that in nineteen years of employment she had never prepared a service rating for dismissal.  It is undisputed that the following individuals were involved in the decision to terminate plaintiff's employment: Rudolph Jones, Lisa Owens, Michele Farieri, and Carol Scherer. (Exh. N, Defendants' Answers to Interrogatories, #3).

Ms. Scherer was advised to begin preparation of the service rating on or about October 19, 2001, (Exh. L at 27) the very day that plaintiff spoke with Ms. Farieri about being "set up" for dismissal.  Ms. Scherer had drafted a service rating and forwarded it to Ms. Farieri and Ms. Owens on the afternoon of October 26, 2001, which was a Friday. (Exh. M, Draft Service Rating) Although the service rating prepared by Ms. Scherer rated plaintiff "good" in the category of "judgment", Ms. Owens or Ms. Farieri advised her to change this category to "less than good."(Exh. L, Scherer depo at 36-38)  On October 29, 2001, prior to plaintiff's

10

termination, DSS was in possession of plaintiff's medical certificate. (Exh. C at 19) In accordance with the Contract and Guidelines, DSS should have considered this information prior to terminating plaintiff's employment.(Exh. B and D)  Lisa Owens testified that she discussed with Jeanne Anderson, and either Michele Farieri, or Carol Scherer, that because plaintiff did not qualify for FMLA, (family medical leave) as she had not been employed for more than a year, they did not have to consider plaintiff's medical information in reaching their decision to terminate. (Exh. E at 46, 56) Plaintiff was terminated on November 5, 2001 after, at most, five occasions of absence with no consideration of her medically documented chronic condition of migraine headaches.

## III.  LEGAL ARGUMENT

### A.    Standard of Review

A district court may properly grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party.  See Hayes v. New York City Dept. of Corrections, 84 F.3d 614, 619 (2d Cir. 1996); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 721 (2d Cir. 1994), cert. denied, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).  In ruling on a motion for summary judgment, the court

11

asks not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the non-moving party on the evidence presented. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  The ultimate question is whether "there are any genuine factual issues that peroperly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 250, 106 S.Ct. at 2511.

A district court should exercise great caution when asked by an employer to grant summary judgment where that employer's intent is a genuine factual issue.  <u>Carlton v. Mystic Transportation, Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000).  See also, <u>Gallo v. Prudential Residential Services, Ltd. P'ship,</u> 22 F.3d 1219, 1224 (2d Cir. 1994).  In discrimination cases, "where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate." <u>Carlton v. Mystic Transportation, Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000).

**B.  Legal Analysis of Plaintiff's §1983 Claims**

**1.  Selective Treatment**

To establish a violation of the equal protection clause of the fourteenth amendment to the United States constitution the plaintiff must prove that the defendants discriminated against her based on an impermissible, invidious classification.  <u>Washington v. Davis</u>426 U.S. 229, 244-45 (1976).  Therefore the plaintiff must prove that the action "had a discriminatory effect and that it was motivated by a discriminatory purpose." <u>Wayte v. United States,</u> 470 U.S. 598, 608-609

(1985) (applying equal protection clause to claim that government selectively prosecuted in

retaliation for exercise of first amendment right to freedom of speech.)  The plaintiff must

establish that she "compared with others similarly situated, was selectively treated... and... that

such selective treatment was based on impermissible considerations such as race, intent to inhibit

or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

Schnabel v. Tyler, 230 Conn. 735, 762 (1994).

In this case plaintiff claims that she was selectively treated because of her race, when she

was hired as an SST and others, similarly situated, that is, others with college degrees, were hired

as CCTs.

Plaintiff further complains that she was selectively treated because she had complained of

race discrimination and complained of retaliation.  She is not required to demonstrate invidious

discrimination by introducing direct evidence of similarly situated persons who had been treated

differently, for example, other people who had complained of discrimination and retained their

jobs. Rather, plaintiff may utilize circumstantial evidence to establish the elements of

discrimination.  In this case, the circumstantial evidence that defendants discriminated against

plaintiff is that they hired others with bachelor's degrees as CCTs.  Although minorities in other

regions with bachelor's degrees were hired as CCTs, all minorities with Bachelor's degrees in

the North Central Region, for which Silvana Flattery is the Regional Administrator, were hired

as SSTs.  Moreover, the individual from the SEBAC list that DSS was avoiding hiring was a

13

black male.

As to plaintiff's claim that she was retaliated against, defendants did not follow the Guidelines or the Contract, the existence of which is to provide a uniform way of dealing with, for example, attendance issues. The fact that DSS deviated from that uniform way of dealing with plaintiff's alleged attendance problem is the circumstantial evidence from which a jury can infer selective treatment. See DiMartino v. Richens, 263 Conn. 639, 674-75 (2003); Zahorik v. Cornell University, 729 F.2d 85, 93 (2d Cir. 1984).

### 2. Qualified Immunity

It is well settled that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Here, the appropriate inquiry is whether, in 2001, it was apparent that 1) hiring someone at a lower level classification and with a lower salary than they are entitled to because of their race was unlawful; and 2) whether terminating someone's employment because they complained of race discrimination and retaliation was unlawful. The answer is clearly in the affirmative. Furthermore, it was not objectively reasonable for the individual defendants to believe that their actions did not violate the clearly established law. Their proffered reasons for acting as they did are not supported by the facts, that is, they did not cite the authority for "underfilling" a position, and did not follow

14

the Contract and Guidelines in terminating plaintiff's employment. The court should deny

summary judgment as to the issue of qualified immunity.

### 3. Damages Against Individual Defendants

Defendants Flattery, Jones, Farieri, and Scherer have been sued under Section 1983 in

their individual capacities. In the Second Circuit, "personal involvement of the defendants in

alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983.

Moffit v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir. 1991). A plaintiff must allege a

tangible connection between the acts of the defendant and the injuries suffered." Bass v. Jackson,

790 F.2d 260, 263(2d Cir. 1986). A plaintiff may establish personal involvement within the

meaning of Section 1983 in the following ways:

> The defendant may have directly participated in the infraction. A supervisory official,
> after learning of the violation through a report or appeal, may have failed to remedy the
> wrong. A supervisory official may be liable because he or she created a policy or custom
> under which unconstitutional practices occurred, or allowed such a policy or custom to
> continue. Lastly, a supervisory official may be personally liable if he or she was grossly
> negligent in managing subordinates who caused the unlawful condition or event.

Moffit, 950 F.2d 886.

Here, each of the individual defendants, except Ms. Flattery, were involved in the

decision to terminate the plaintiff, which is undisputed. Silvana Flattery learned of the

termination when she signed the service rating and failed to remedy the wrong and or created a

policy or custom under which such unconstitutional practices occurred, and/or was grossly

negligent in managing subordinates, in this case Lisa Owens, who caused the termination to

15

occur. Finally, Ms. Flattery was involved in the decision to hire plaintiff as an SST and/or created a policy or custom under which such unconstitutional practices as race discrimination occurred, and/or was grossly negligent in managing subordinates, in this case Lisa Owens, who took responsibility for hiring plaintiff as an SST rather than a CCT. Summary judgment as to the individual defendants is not warranted.

### C. Legal Analysis of Plaintiff's Title VII Claims

### 1. Retaliation

Title VII prohibits retaliation against employees who have "opposed any discriminatory employment practice." 42 U.S.C. 2000e-3(a) and Conn. Gen. Stat. §46a-60(a)(4). This includes making informal protests of discriminatory employment practices, including making complaints to management..." Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (1990) It is essential to note that it is not necessary that plaintiff prove that she actually experienced the discriminatory employment practice of which she complained; it is sufficient to establish liability under the anti-retaliation provisions of Title VII if a plaintiff has a subjective good faith belief that the discriminatory practice of which she complains actually occurred. Sumner v. U.S. Postal Service, 899 F.2d at 20.

The familiar McDonnell Douglas burden shifting analysis has been regularly applied by courts within the Second Circuit to evaluate cases involving retaliation for complaining of discriminatory treatment under Title VII.. Sumner v. U.S. Postal Service, *supra*; Hill v.

16

Pinkerton Security & Investigation Services, Inc., 977 F.Supp. 148 (1997).  Pursuant to this analysis, the plaintiff must make out a prima facie case of retaliation by establishing: (1) she opposed a discriminatory employment practice; (2) the employer knew of this activity; (3) she suffered an adverse or disadvantageous employment action; and (4) a causal relationship exists between the protected activity and the employment action.  Sumner, *supra*; Hill, *supra*.

The burden on the plaintiff of presenting a prima facie case under McDonnell Douglas is "minimal." Roge v. NYP Holdings, 257 F.3d 164, 168 (2d Cir. 2001). "Plaintiff's burden at this stage is not to win the battle of evidence. She must merely put forward eviodence that creates a reasonable inference of [retaliation] as to her." Shaw v. Greenwich Anesthesiology Associates, 137 F.Supp. 2d 48, 61 (2001).  See also, Viola v. Philips Med. Sys., 42 F.2d 712, 716 (2d Cir. 1994)(A grant of summary judgment is proper only if the evidence of [retaliatory] intent is so slight that no rational jury could find in plaintiff's favor.")

Here it is undisputed that the plaintiff meets the first two criteria of a prima facie case. She engaged in opposing discriminatory practices twice: first when she complained to Lily Marshall that she was discriminated against when she was hired as an SST as opposed to a CCT because of her race; and second when she complained to Michele Farieri of the perceived retaliation by Carol Scherer.  Because plaintiff complained directly to her employer in each instance, it is also evident that the employer was aware of plaintiff's protected activity. All that is necessary to prove that the employer was aware of plaintiff's participation in protected activity is

17

general corporate knowledge. <u>Gordon v. NYC Bd. of Ed.</u>, 232 F.3d 111 (2d Cir. 2000)(a jury can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, so long as the jury finds that ... an agent is acting explicitly or implicitly upon the orders of a superior who has the requisite knowlege); <u>Alston v. NYC Trans. Auth.</u>, 14 F.Supp. 2d 308, 311 (S.D.N.Y. 1998)(in order to satisfy the second prong of her retaliation claim, plaintiff need not show that individual decision-makers knew that she had filed a complaint).

It is also undisputed that plaintiff suffered an adverse employment action when she was terminated on November 5, 2001.

The final element of plaintiff's prima facie case is to establish a causal connection between her protected activity and the adverse employment action. Such causal connection can be established if the adverse action follows closely after an exercise of protected rights. See, e.g. <u>Manoharan v. Columbia Univ. College of Physicians and Surgeons</u>, 842. F.2d 590, 593(2d Cir. 1988); <u>Raniola v. Bratton</u>, 243 F.3d 610, 624 (2d Cir. 2001). Such a causal connection exists here. Within four to five weeks after complaining to Cookie Marshall, plaintiff was terminated. Likewise, within one or two weeks of complaining of retaliation to Michele Farieri, plaintiff was terminated. In fact, Carol Scherer testified that she began preparing the service rating for the purpose of dismissing plaintiff on the same day that plaintiff complained to Ms. Farieri of retaliation by Ms. Scherer. Specifically, Ms. Scherer testified that she was told by Michele Farieri or Lisa Owens to prepare a service rating for Tiana Armstrong for purposes of dismissal

18

and that she was told this a week before she prepared it. The preparation of the performance

appraisal took place on October 26, 2001. One week before that was October 19, 2001. Thus,

plaintiff can establish a causal connection and complete her prima facie case as to the retaliation

by DSS.

Once a plaintiff established a prima facie case of retaliation under Title VII or CFEPA,

the burden shifts to the defendant to proffer a legitimate non-discriminatory reason for the

adverse employment action of which plaintiff complains. Sumner, 899 F.2d 209. If the

defendant does so, all presumptions drop out of the case, and the plaintiff is left with the ultimate

burden of proving that a desire to retaliate against her was, at least in part, the motivation of

defendant. Sumner, 899 F.2d  208-209; Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d

Cir. 1998);Roge v. NYP Holdings, 257 F.3d 164, 168 (2d Cir.2001).  The burden is then on the

plaintiff to prove "that the legitimate reasons offered by the defendant were not its true reasons,

but were a pretext for discrimination" Id., citing Reeves v. Sanderson Plumbing Products, Inc.,

530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Reeves v. Sanderson Plumbing Products, Inc. is the seminal case defining the plaintiff's

burden after the McDonnell Douglas presumption drops out of the case.

> After Reeves, the court must examine each case to 'determine whether the plaintiff could
> satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally
> discriminated against the plaintiff' Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000)
> (quotation marks and citations omitted).  Showing the employer's proffered legitimate
> explanation for termination is not worthy of belief is 'one form of circumstantial evidence
> that is probative of intentional discrimination, and it might be quite persuasive.  In

19

appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.' Reeves, 530 U.S. at 147, 120 S.Ct. at 2108-09 (internal citation omitted).

Windham v. Time Warner, Inc., 275 F.3d 179, 187-88 (2d Cir. 2001). In other words, in applying Reeves, district courts are clearly instructed that in some cases plaintiff's ultimate burden of proving that an intent to discriminate was a factor in the employer's decision making can be established by the same evidence that establishes the prima facie case and that the proffered explanation for the adverse action is false. It must also be remembered, that "because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence and is usually constrained to rely on circumstantial evidence." Chambers v. TRM Copy Centers Corp, 43 F.2d 29, 37 (2d Circ. 1994).

Here, the proffered legitimate business reason for termination is that plaintiff was in her working test period and they could terminate her because she had a number of absences. It is noteworthy that the defendants have not offered any explanation as to why they did not follow the Guidelines or Contract in terminating plaintiff's employment, other than to say that she had no right to grieve the termination because she was in her working test period, so they could choose not to follow the Contract or Guidelines. Assuming this contention satisfies defendants' burden, the presumption of discrimination drops out of the case in connection with the claimed discriminatory action.

20

There are, however, enough disputed material facts, including those comprising plaintiff's prima facie case, from which a jury could conclude that the employers proffered reason for its adverse action was false and that the plaintiff was the victim of retaliation.  It is undisputed that plaintiff was covered by the Contract, except with respect to her ability to grieve her termination.  That is, despite being in her working test period, the contract provisions regarding occasions of absence, medical certificates, service ratings and termination would apply to plaintiff.  Likewise the Guidelines governing attendance should have applied to plaintiff and, in fact, Lisa Owens instructed Carol Scherer to follow the Guidelines in disciplining plaintiff regarding her absences.  Contrary to these instructions and at the direction of Ms. Owens, defendants then disregarded the Contract and Guidelines.  For example, plaintiff was given an informal counseling when she had, at most, four occasions of absence.  Such counseling usually occurs after the fifth occasion.  She was not offered union representation at that meeting.  Her medical certificate was ignored, even though the Guidelines and the Contract mandate that such information be considered.  Plaintiff was terminated on the same day she was given a service rating, even though the Policy states that only a second unsatisfactory service rating justifies a dismissal.  Therefore, if the usual rules and procedures were not followed as to plaintiff, and the defendants have no legitimate explanation for same, a jury could infer retaliation.  "Departures from procedural regularity can raise a question as to the good faith of the process where the departure may reasonably affect the decision." Stern v. Trustees of Columbia University, 131

21

F.3d 305, 313 (2d Cir. 1997)(citations omitted).

In addition to the possibility of a jury concluding that the proffered reason for the termination was false, the jury can rely on the aspects of plaintiff's prima facie case to conclude discrimination occurred.  The timing of plaintiff's termination, within weeks of her complaint of discrimination is suggestive of a retaliatory motive.  Certainly these facts would be sufficient to support a fact finder's conclusion that Ms. Armstrong was the victim of illegal retaliation. Summary judgment cannot be granted as to plaintiff's retaliation claim.

As a final note, in considering a defendant's motion for summary judgment in an employment discrimination case, the Second Circuit's decision in Quinn v. Green Tree Credit Corp., 159 F.3d 759 (1988) is particularly instructive.  There, after the presumption of discrimination dropped out of the case by employer's proffer of a legitimate non-discriminatory reason for its adverse action, the court relied upon two factors to find that a jury was required to consider plaintiff's claims.  The two factors defeating summary judgment in Quinn were the temporal proximity between the protected activity and the adverse action, and the fact that the alleged harassers were responsible for generating the alleged non-discriminatory reason for the adverse action.

Here, it is undisputed that those who "participated" in the decision to terminate plaintiff were Rudolph Jones, Lisa Owens, Michele Farieri, and Carol Scherer.  There is evidence from which a jury could infer that Silvana Flattery participated as well since she was made aware of

22

what was occuring with respect to Tiana Armstrong.  Lisa Owens, who worked closely with Jean Anderson and Silvana Flattery and "kept them abreast" of her actions with regard to both Tiana's initial complaint and the decision to terminate, was also the person who decided to hire plaintiff as an SST thereby avoiding hiring a black male as a CCT.

The role of Lisa Owens in instructing that plaintiff be terminated, in contravention of the Contract and Guidelines, creates a strong inference that the proffered reasons for the termination, that plaintiff was in her working test period and therefore could be terminated for her absences, are not true.  Instead, as in Quinn, the material facts in dispute, allow for the inference that the real reason, or at least one of the factors, for plaintiff's termination was that she complained, and complaints about discrimination and/or retaliation were not tolerated at DSS.  In light of these disputed material facts, summary judgment is wholly inappropriate, and plaintiff is entitled to have her claim decided by a jury.

### 2.  Race Discrimination

To establish a prima facie case of race discrimination under Title VII, plaintiff must demonstrate that 1)she was in the protected class; 2) he was qualified for the position; 3)she was subject to an adverse employment action; and 4)the adverse employment action occurred under "circumstances giving rise to an inference of discrimination." Terry v. Ashcroft. 336 F.3d 128, 138 (2d Cir. 2003).  In this case, plaintiff was within the protected class, was qualified for the position, and suffered an adverse employment action in that she was paid less as an SST than as a

23

CCT and had a longer training period.  Such economic consequences and the less distinguished

title clearly  meet the well established test of "adverse employment action." Id.

Circumstances giving rise to an inference of discrimination are also present.  All SSTs

hired in the North Central Region with college degrees were minorities.  Others with college

degrees who interviewed for the same position as plaintiff in other parts of the State were hired

as CCTs.  Although some of those were minorities, fair treatment of some members of a

protected class does not excuse discrimination. Connecticut v. Teal, 457 U.S. 440, 445 (1982).

Moreover, an individual who should have been hired as a CCT off the SEBAC list for the North

Central Region, but was not hired, was African American, indicating a pattern of racial

discrimination with respect to hiring of CCTs in the North Central Region.

Defendants assert that there "legitimate business reason" for hiring plaintiff as an SST

instead of a CCT is the superior right of the individual on the SEBAC list, a black male, to a

CCT position, prior to hiring individuals outside the list as CCTs.  Defendants assert their right

to "underfill" the position without any reference to the source of their authority to do so.  It

seems clear that "underfilling" is a strategy for avoiding the purpose of SEBAC employment

obligations and is not a "legitimate" reason for denying plaintiff a CCT position.

Even assuming that defendant's proffered reason were legitimate, it is a question of fact

whether or not such reason is a pretext for discrimination because all of the individuals hired as

SSTs with college degrees were minorities, as well as the individual the state was seeking to

24

avoid hiring.  Summary judgment is not warranted on plaintiff's race discrimination claim under Title VII.

## CONCLUSION

For all the foregoing reasons, and based on the facts and arguments set forth in this memorandum and in the accompanying 56(a)(2) Statement, defendants' motion for summary judgment must be denied.


THE PLAINTIFF, TIANA ARMSTRONG


_____

Barbara E. Gardner
CT07623
843 Main St., Suite 1-4
Manchester, CT 06040
(860)643-5543
(860)645-9554(fax)
Bg@bgardnerlaw.com

25

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this 27th day of September, 2004, to:

Tammy D. Geathers
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

_____
Barbara E. Gardner