UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

TIANA ARMSTRONG,                    :
  Plaintiff,                        :        2005 JAN 26  P 5: 26
                         :
v.                                  :        U.S. DISTRICT COURT
                         :   Civil No. 3:02CV2264
                         :        HARTFORD, CT.
STATE OF CONNECTICUT                :
DEPARTMENT OF SOCIAL SERVICES,:
SILVANA FLATTERY, MICHELE           :
FARIERI, CAROL SCHERER,             :
RUDOLPH JONES,                      :
  Defendants.                      :

## RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is an action for damages brought pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, 42 U.S.C. §

1983, and the Connecticut Fair Employment Practices Act (CFEPA),

Conn. Gen. Stat. § 46a-60.  Specifically, the plaintiff, Tiana

Armstrong, alleges that the State of Connecticut Department of

Social Services (DSS) and the individual defendants, Silvana

Flattery, Michele Farieri, Carol Scherer and Ruldoph Jones, in

their individual capacities, discriminated against her on the

basis of her race.  First, Armstrong argues that the defendants

discriminated against her when they hired her at "a lower level

than other similarly situated employees."  Second, Armstrong

alleges that the defendants fired her in retaliation "for [her]

having complained of 1) race discrimination and 2) retaliation."

The defendants have filed the within motion for summary

judgment (document no. 29-A) pursuant to Fed. R. Civ. P. 56,

arguing that the plaintiff has failed to raise a genuine issue of

1

material fact and that the defendants are therefore entitled to judgment as a matter of law.  In addition, the defendants argue that the doctrines of sovereign immunity and qualified immunity bar the action.  Armstrong responds that summary judgment should be granted on the CFEPA claims, but "summary judgment is not warranted" on the "counts under 42 U.S.C. § 1983 and Title VII" because there are "numerous issues of material fact in dispute."

The issues presented are: 1) whether Armstrong has raised genuine issues of material fact to support her Title VII disparate treatment claim; 2) whether Armstrong has raised genuine issues of material fact to support her Title VII retaliation claim; 3) whether Armstrong has raised genuine issues of material fact to support her 42 U.S.C. § 1983 equal protection selective treatment claim; 4) whether the individual defendants are entitled to qualified immunity; and 5) whether sovereign immunity bars Armstrong's CFEPA claims.

For the reasons stated below the court concludes: 1) Armstrong has raised genuine issues of fact as to her Title VII disparate treatment claim; 2) Armstrong has raised genuine issues of fact as to her Title VII retaliation claim; 3) Armstrong has raised genuine issues of fact as to her section 1983 equal protection claim; 4) the individual defendants are not entitled to qualified immunity; and 5) sovereign immunity does bar Armstrong's CFEPA claims.

2

Therefore, for the reasons that follow, the defendants'
motion for summary judgment (document no.33-A) is DENIED in part
and GRANTED in part.

## FACTS

Examination of the complaint, Local Rule 56(c)(1),
statements, exhibits, motion for summary judgment, and the
response thereto reveals the following undisputed, material
facts:

On May 22, 2001, the Connecticut Department of Social
Services (DSS) published a job vacancy notice.  The notice stated
that DSS was recruiting "for eligibility services worker
position(s)" in the "North Central Region encompassing the
Hartford, Manchester, New Britain, and Bristol Offices."

According to the notice, there were three levels of
eligibility services worker positions.  The lowest paying
position, social services trainee (SST), paid $30,813.00 to
$39,309.00.  The mid-level position, Connecticut careers trainee
(CCT), paid $32,289.00 to $41,076.00.  The highest paying
position, eligibility services worker, paid $39,175.00 to
$49,122.00.  The notice specified that DSS would fill the
positions with "candidates who are eligible for appointment as
eligibility services worker, SST, or CCT, or the positions will
be filled by existing lists which we are obliged to use."

3

The plaintiff, Tiana Armstrong, an African American female with a bachelor's degree, applied for a position. Armstrong asserts that DSS told her during the interview process that it was considering her for a CCT position. There is an issue of fact as to what DSS actually told Armstrong during her interview.

On or about August 17, 2001, DSS offered Armstrong a position at the lowest paying level, SST, and Armstrong accepted the job. Between July 23, 2001 and November 14, 2001, DSS hired a total of fifteen applicants to fill the various eligibility service worker positions. DSS hired the following people as CCTs: three white females, two African American females, one African American male, and a male and two females of unspecified race. DSS hired the following people as SSTs: one white female, three African American females, one Hispanic female, and one African American male. Armstrong and the Hispanic female were the only individuals with bachelors degrees who DSS hired as lower paying SSTs. DSS hired all other individuals with bachelors degrees as CCTs.

Shortly after August 17, 2001, Armstrong began working at DSS as a SST. The events at issue occurred during Armstrong's probationary "working test period."

Armstrong argues that throughout her employment with DSS, she suffered from chronic migraine headaches. There is an issue of fact as to when Armstrong told her supervisors that she suffered from migraines.

On August 24, 2001, approximately a week after DSS hired her, Armstrong attended a mandatory human resources orientation. At orientation, DSS gave Armstrong a packet of handouts, including the DSS "Time and Attendance Policy." Sometime during orientation, Armstrong argues that she and a Hispanic female SST realized that the they were the only individuals with bachelors degrees who DSS had placed in the lower paying SST position.

On the morning of Friday, August 31, 2001, Armstrong left a message for her supervisor stating that she would not be coming to work that day. There is an issue of fact as to the explanation that Armstrong gave for her absence.

The next Thursday, September 6, 2001, Armstrong told her supervisor that she would not be attending work. Again, there is an issue of fact as to what explanation Armstrong gave for her absence. The next morning, September 7, 2001, Armstrong told her supervisor that she had food poisoning and had scheduled a doctor's appointment during work hours. Armstrong missed one and a half hours of work that day. On September 17, 2001, ten days later, Armstrong was again absent from work.

DSS scheduled Armstrong to attend a mandatory orientation session, entitled Curricula for Orientation, Reinforcement and Enrichment (CORE), on September 26, 2001 at 9:30 a.m.  That morning, DSS canceled the CORE training.  The same morning, Armstrong informed her supervisor that she had a doctor's appointment and that she would be late for work.  There is an issue of fact whether Armstrong was aware that DSS had cancelled CORE when she called to report that she would be late.

Armstrong admits that she did not arrive at work until 1 p.m. that afternoon.  When Armstrong arrived at work, she met with one Lisa Owens, personnel officer for DSS's North Central Region.  Owens gave Armstrong a medical certificate for her doctor to sign regarding her sick days.

Sometime in October, Armstrong contacted one Lily Marshall in human resources and asked why DSS had hired her as a SST rather than a CCT.  Armstrong asserts that she discussed whether DSS had discriminated against her on the basis of her race. Marshall gave Armstrong an explanation for why DSS hired her as a SST: pursuant to state regulations, before an agency can hire a new applicant, the agency must first hire an individual off of a list of people recently laid off by the State (the SEBAC list).

Both parties agree that an African American male was on the SEBAC list at the time that DSS interviewed Armstrong.  Both parties agree that before DSS could hire Armstrong to the mid-

level CCT position, first it would have had to hire this individual off the SEBAC list. The defendants argue that "DSS, in hiring the plaintiff [at the SST level] over the individual on the SEBAC List, exercised its right to under-fill the position by not taking the individual off the SEBAC List." Armstrong argues that DSS did not have a "right to under-fill the position," and that DSS refused to hire the individual off the list and hire Armstrong as a CCT because of her race.

On October 5, 2001, DSS held an "informal counseling session" with Armstrong about her absences from work. In attendance were, one Carol Scherer, Armstrong's DSS supervisor, and one Michele Farieri, a DSS field operation's manager. A union representative was not present and there is an issue of fact whether Armstrong was entitled to have one present. At that meeting, Scherer gave Armstrong a "letter of informal counseling for attendance issues" and a copy of the DSS "Attendance and Tardiness Guidelines." Furthermore, Scherer warned Armstrong that "any additional occasions of absence may result in administrative action up to and including dismissal." Armstrong told Scherer and Farieri that she understood the policies.

At the end of the October 5th meeting, Armstrong met with Farieri alone. Armstrong asked why DSS hired her as a SST. Armstrong asserts that she told Farieri that she believed that DSS discriminated against her on the basis of her race. There is

an issue of fact whether Farieri knew prior to this meeting that Armstrong had complained about DSS's hiring her as a SST. Farieri states that she had no knowledge of such complaints prior to this meeting.

There is an issue of fact whether sometime around October 12, 2001, Armstrong met with Marshall to report that she felt that "she was being 'set up' by her supervisor for termination" and "wondered if it had something to do with the questions she had been asking about being hired as an SST rather than a CCT."

On October 18, 2001, Scherer and Armstrong met again. Armstrong asserts that Scherer reprimanded her for taking her morning break too late. The next day, on October 19, 2001, Armstrong met with Farieri again. There is an issue of fact whether Armstrong complained about Scherer's treatment of her and whether Armstrong explained that her absences from work were the result of her migraines.

On October 25, 2001, Armstrong did not attend work. The defendants argue that this was Armstrong's "sixth occasion of absence from work" while Armstrong argues that it was not her sixth absence. The defendants argue that this was "the first time that her supervisor heard about the plaintiff suffering from migraines."

8

The next day, October 26, 2001, Scherer filled out an "interim performance appraisal" form evaluating Armstrong's job performance. Scherer first rated Armstrong's judgment as "good: fairly reliable." Scherer states that one of her supervisors later instructed her to change her appraisal of Armstrong's judgment to "less than good: inclined to be illogical."

On October 29, 2001, Owens, the personnel officer for DSS's North Central Region, wrote a memo to one Rudolph Jones, DSS director of human resources, recommending that DSS fire Armstrong. Specifically, the memo stated "[b]ased on the serious nature of the employee's absenteeism as well as the [u]nsatisfactory [s]ervice [r]ating, we recommend that Ms. Armstrong be dropped during her working test period immediately."

On November 5, 2001, Owens wrote to Armstrong informing her that she was being "separated from State service for "failure to complete [the] initial probationary period" and for "a service rating dated October 26, 2001 which indicates less than satisfactory performance."

After her discharge, Armstrong filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities (CCHRO). The CCHRO dismissed the charge.

## STANDARD

The court appropriately grants summary judgment when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. at 247-48.  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . [and] it should be interpreted in a way that allows it to accomplish this purpose." Celotex v. Catrett, 477 U.S. 317, 323-324 (1986).

### DISCUSSION

## I.  Title VII Claims Against DSS

The defendants first argue that Armstrong has failed to raise genuine issues of material fact to support her Title VII causes of action.  Armstrong responds that she has raised genuine issues of fact as to both of her Title VII causes of action.

Title VII makes it unlawful for "an employer . . . to discriminate against any individual because of such individual's . . . race."  42 U.S.C. § 2000e-2(a).  Armstrong relies on two theories to establish Title VII violations: (1) disparate treatment and (2) retaliation.

Following McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to prevail on any Title VII cause of action, the plaintiff must first meet the "initial burden of establishing a prima facie case of discrimination." Harper v. Metro. Dist. Comm'n, 134 F. Supp. 2d 470 (D. Conn. 2001)(internal quotation marks and citations omitted).  Second, if the plaintiff establishes a prima facie case "the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003). See also, Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).  Third, the plaintiff must present evidence "sufficient to permit a rational finder of fact to infer that the defendant's employment decision

11

was more likely than not based in whole or in part on discrimination." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)(citing Stern v. Trustees of Columbia Univ. in City of N.Y., 131 F.3d 305, 312 (2d Cir.1997)). This burden shifting framework governs Armstrong's Title VII disparate treatment claim and her Title VII retaliation claim.

### A.    Title VII Disparate Treatment Race Discrimination

The defendants argue that Armstrong is "unable to establish that she suffered race or national origin discrimination." First, the defendants argue that Armstrong "[s]uffered no 'adverse employment action.'"  Second, the defendants argue that Armstrong has not produced "[e]vidence of [c]ircumstances [g]iving [r]ise [t]o [a]n [i]nference of [d]iscrimination."

Armstrong responds that she did suffer an adverse employment action when the defendants "classified her as an SST because of her race."  Furthermore, Armstrong asserts that she has presented evidence of "[c]ircumstances giving rise to an inference of discrimination."

Following McDonnell Douglas, Armstrong must first establish a prima facie case of disparate treatment.  "The burden that a plaintiff, alleging that [she] was discriminated against by [her] employer, carries to survive a summary judgment motion at the prima facie stage is a minimal one." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

12

To establish a prima facie case of disparate treatment, a plaintiff must show that,

> 1) the plaintiff is a member of a protected class; 2) the plaintiff is qualified for the position; 3) the defendant took adverse employment action against the plaintiff; and 4) the adverse employment action 'occurred under circumstances giving rise to an inference of discrimination.'

Harper v. Metro. Dist. Comm'n, 134 F. Supp. 2d 470 (D. Conn. 2001)(citing Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994)). The defendants do not dispute that Armstrong is a member of a protected class and that she was qualified for the position. The gravamen of the defendants' argument for summary judgment is that Armstrong has not put forward any evidence as to the prima facie case's third element, adverse employment action, or fourth element, circumstances giving rise to an inference of discrimination.

### 1.   Adverse Employment Action

An adverse employment action is a "'materially adverse change' in the terms or conditions of employment." Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004). Materially adverse changes in working conditions include "a decrease in wage or salary, [and] a less distinguished title . . ."Id. Examples of adverse employment actions include "refusal to hire, [and] refusal to promote." Wheeler v. Natale, 137 F. Supp. 2d 301, 304 (S.D.N.Y. 2001).

13

Armstrong argues that she "suffered an adverse employment action" when DSS refused to hire her as a CCT. Specifically, Armstrong argues that as a SST she "was paid less . . . than as a CCT and had a longer training period." It is undisputed that DSS refused to hire Armstrong as a CCT, and that the SST position paid her less than she would have earned as a CCT. The court therefore concludes that Armstrong suffered an adverse employment action when DSS refused to hire her as a CCT. By presenting evidence that she suffered an adverse employment action, Armstrong has satisfied the third requirement of the prima face case for Title VII disparate treatment.

### 2.   Circumstances Giving Rise to an Inference of Discrimination

The fourth element of the prima facie case requires that the plaintiff present evidence that "the adverse employment action occurred under circumstances giving rise to an inference of discrimination." Harper v. Metro. Dist. Comm'n, 134 F. Supp. 2d 470 (D. Conn. 2001)(internal citations and quotations omitted).

"[D]irect evidence of discrimination is not necessary." Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001)(quoted in Grey v. City of Norwalk Bd. of Educ., 304 F. Supp. 2d 314, 325 (D. Conn. 2004)). The United States Supreme Court has stated that "proof of discriminatory motive . . . can in some situations be inferred from the mere fact of the differences in treatment." Teamsters v. United States, 431 U.S. 324 (1977).

14

One way that a plaintiff may raise an inference of discrimination is "by showing that the employer . . . treated [her] less favorably than a similarly situated employee outside [her] protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). The plaintiff must present evidence that "she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." Id. (quoting Shumway v. United Parcel Serv., 118 F.3d 60, 64 (2d Cir. 1997)). This standard "requires a reasonably close resemblance of the facts and circumstances . . . rather than a showing that both cases are identical." Id. The issue of whether employees are similarly situated "ordinarily presents a question of fact for the jury." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).

Armstrong argues that the following circumstances give rise to an inference of discrimination: 1) "[o]thers with college degrees who interviewed for the same position as plaintiff in other parts of the State were hired as CCTs," 2) "[a]ll SSTs hired in the North Central Region with college degrees were minorities," and 3) that an African American "who should have been hired as a CCT off the SEBAC list . . . was not hired . . . indicating a pattern of racial discrimination with respect to hiring of CCTs in the North Central Region."

15

Armstrong has presented evidence that in the months before
and after her hiring, between July 23, 2001 and November 14,
2001, DSS hired a total of eleven applicants with bachelors
degrees as CCTs or SSTs.  DSS placed all three white applicants
with bachelors degrees and two minority applicants with bachelors
degrees in CCT positions.[1]  The only applicants with bachelors
degrees that DSS placed in the lowest paying SST positions,
Armstrong and a Hispanic females, were minorities.

The court concludes that in this context Armstrong has met
her minimal prima facie burden of presenting evidence that "the
adverse employment action occurred under circumstances giving
rise to an inference of discrimination."  Harper v. Metro. Dist.
Comm'n, 134 F. Supp. 2d 470, 483 (D. Conn. 2001)(internal
citations and quotations omitted).

### 3.    Defendant's Non Discriminatory Reason

Because Armstrong has succeeded in making out a prima facie
case of Title VII disparate treatment, the burden shifts to the
defendants to provide a "legitimate, non discriminatory reason"
for not hiring Armstrong as a CCT. Cruz v. Coach Stores, 202 F.3d
560, 567 (2d Cir. 2000).  The defendants state that the non

---

[1] The fact that DSS hired other minority applicants with
bachelors degrees as CCTs does not entitle the defendants to summary
judgment.  The Second Circuit has stated that "an employer may not
escape liability for discriminating against a given employee on the
basis of race simply because it can prove it treated other members of
the employee's group favorably." Graham v. Long Island R.R., 230 F.3d
34, 43 (2d Cir. 2000).

discriminatory reason for refusing to hire Armstrong as a CCT was
that another "individual . . . was on the SEBAC list" and DSS
"could not have the plaintiff in the CCT position/classification,
until the individual on the SEBAC list was hired." For purposes
of summary judgment, the defendants have therefore articulated a
"legitimate, non discriminatory reason" for their decision not to
hire Armstrong as a CCT.

### 4.   Inference of Discrimination

Since the defendants have set forth a non discriminatory
reason for not hiring Armstrong as a CCT, the burden reverts back
to Armstrong to produce evidence from which a jury could
reasonably draw an inference of discrimination.

A plaintiff may meet this burden by "showing that similarly
situated employees belonging to a different racial group received
more favorable treatment." Graham v. Long Island R.R., 230 F.3d
34, 43 (2d Cir. 2000). Such evidence can also "serve as evidence
that the employer's proffered legitimate, non-discriminatory
reason for the adverse job action was a pretext for racial
discrimination." Id.

As explained above, Armstrong has presented evidence that
DSS placed white applicants who, like Armstrong, had bachelors
degrees, in the CCT position, while placing Armstrong in the SST
position. "[G]iven the fact-intensive inquiry that questions of
employer intent involve," Armstrong has presented evidence that

17

raises a genuine issue of fact whether DSS violated Title VII in refusing to hire her as a CCT.  The court concludes that the issue of whether DSS discriminated against Armstrong on account of her race is "better left to the trier of fact than to the court on summary judgment."  Grey v. City of Norwalk Bd. of Educ., 304 F. Supp. 2d 314, 325, 328 (D. Conn. 2004).  The defendants motion for summary judgment is therefore denied as to Armstrong's Title VII disparate treatment claim.

### B.    Title VII Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee for having "opposed any [unlawful employment] practice . . ." 42 U.S.C. § 2000e-(3)(a).

Pursuant to McDonnell Douglas, the plaintiff has the initial burden of establishing a prima facie case of Title VII retaliation. Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1177 (2d Cir. 1996).  A prima facie claim of retaliation requires that the plaintiff show,

> (i) participation in a protected activity known to the defendant; (ii) an employment action disadvantaging the plaintiff; (iii) a casual connection between the protected activity and the adverse employment action.

Tomka v. Sheiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995).

The defendants argue that Armstrong "has not stated a cause of action for retaliation" and that Armstrong's "retaliation [claim] is at best, ambiguous."  Specifically, the defendants argue that Armstrong "is unable to demonstrate that there is a

18

causal" link between "any of the incidents alleged in the
complaint, e.g., her inquiry regarding her classification as an
SST" and "her termination from DSS." Armstrong responds that she
has raised genuine issues of fact as to each part of the Title
VII retaliation claim.

### 1. Opposition to Discriminatory Practice and Adverse Employment Action

To satisfy the prima facie case's first requirement,
"participation in protected activity known to the defendant,"
Armstrong must present evidence that she took action "to protest
or oppose statutorily prohibited discrimination." Cruz v. Coach
Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). Such activity
"need not rise to the level of a formal complaint." Id. Title
VII also protects less formal opposition to prohibited
discrimination, including "making complaints to management." Id.
(quoting Sumner v. United States Postal Serv., 899 F.2d 203, 209
(2d Cir. 1990)).

Armstrong argues that she "opposed a discriminatory
employment practice" when she complained 1) "to Lily Marshall
that she was discriminated against when she was hired as an SST
as opposed to a CCT because of her race" and 2) "to Michele
Farieri of the perceived retaliation by Carol Scherer." Because
Armstrong has presented evidence that she made complaints to
management regarding possible race discrimination, she satisfies
the prima facie case's first requirement.

19

To satisfy the prima facie case's second requirement, Armstrong must present evidence of "an employment action disadvantaging the plaintiff." It is undisputed that DSS fired Armstrong. Armstrong's termination was clearly an adverse employment action. See Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)(stating that "[a]dverse employment actions include discharge . . ."). Accordingly, Armstrong has satisfied the second requirement of the prima facie case for Title VII retaliation.

### 2.    Causal Connection

The third prong of the prima facie case requires evidence of a "casual connection between the protected activity and the adverse employment action." Tomka v. Sheiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995). A plaintiff can show a causal connection "indirectly by showing that the protected activity was followed closely by the discriminatory treatment." Richardson v. New York Dep't of Corr. Serv., 180 F.3d 426, 44(2d Cir. 1999).

Armstrong argues that "a causal connection exists here" because DSS terminated her "[w]ithin four to five weeks of complaining to Cookie Marshall" and "within one or two weeks of complaining of retaliation to Michele Farieri." Armstrong has stated under oath that on October 5, 2001 she told Farieri that she believed her race was the reason DSS had not hired her as a

CCT.  Within a month of that complaint, on October 26, 2001,
Scherer asserts that her supervisors instructed her to change her
evaluation of Armstrong from good to fair.  Twelve days later,
DSS fired Armstrong.  Because Armstrong has presented evidence
that these events followed so shortly after her alleged
complaint, Armstrong has met the third and final requirement for
a prima facie case of Title VII retaliation.

### 4.    Non-Discriminatory Reason

The defendants, for their part, have offered a legitimate
non discriminatory reason for their decision to fire Armstrong.
Specifically, they argue that DSS fired Armstrong "due to her
excessive absences."  The defendants have thereby met their
McDonnell Douglas burden of articulating a non discriminatory
reason for their decision to fire Armstrong.

### 5.    Inference of Retaliatory Discrimination

Since the defendants have articulated a non discriminatory
reason for firing Armstrong, the burden reverts back to Armstrong
to produce evidence from which a jury reasonably could draw an
inference of retaliatory discrimination. Sorlucco v. New York
City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989)("The plaintiff
may preclude summary judgment by producing evidence from which a
trier of fact reasonably could draw an inference of
discrimination").

Armstrong has raised multiple issues of fact that might reasonably lead a jury to question DSS's stated reason for terminating Armstrong and support an inference of retaliatory discrimination.  There are questions of fact as to why Scherer's supervisors told her to change her evaluation of Armstrong's judgment from the "good" to "poor."  There are also questions of fact as to when Armstrong informed her supervisors about her alleged migraine headaches and whether DSS should have classified her continued absences as one absence because of this chronic condition.  Furthermore, there is a question as to why Armstrong's supervisors presented her with an "interim" performance appraisal on the day that they fired her instead of providing her with time to improve her performance.

These possible deviations from DSS standard procedure along with the proximity between Armstrong's complaints and her termination, raise questions of fact that are better left for the jury to decide in determining whether there is a causal connection between Armstrong's complaints and her termination. Accordingly, the motion for summary judgment is denied as to the Title VII retaliation claim.

### III. 42 U.S.C. § 1983: Equal Protection Selective Treatment Against Individual Defendants

The defendants next argue that "the plaintiff cannot show a violation of her equal protection rights under 42 U.S.C. § 1983." Specifically, the defendants argue that Armstrong has shown neither that she "compared with others similarly situated, was selectively treated," nor that the defendants had "any discriminatory intent." Armstrong responds that there exists "circumstantial evidence that the defendants discriminated" against her 1) "when they hired her as an SST instead of a CCT" and 2) "when they terminated her employment."

### A.    Section 1983 Generally

To state a cause of action pursuant to section 1983, Armstrong "must allege (1) that the defendants deprived [her] of a right 'secured by the Constitution or the laws of the United States;' and (2) that they did so 'under color of state law.'" Giordano v. City of N.Y., 274 F.3d 740, 750 (2001). The McDonnell Douglas burden shifting framework also applies to section 1983 actions. Sorlucco v. New York City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989).

B.    **Equal Protection of the Laws**

Armstrong alleges that the defendants deprived her of her right to the equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.  The Fourteenth Amendment states, in part, that no state shall "deny to any person . . . the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This guarantee to the equal protection of the laws "prohibits the government from treating similarly situated persons differently."  Sound Aircraft Servs., Inc. v. Town of East Hampton, 192 F.3d 329, 335 (2d Cir. 1999).

A plaintiff may show a violation of the equal protection clause by presenting evidence that "a government actor intentionally discriminated against [her] because of [her] race."  Brown v. City of Oneota, N.Y., 221 F.3d 329, 337 (2d Cir. 2000).

The Second Circuit recognizes the similarity between Title VII discrimination claims and section 1983 equal protection claims based on racial discrimination.  "Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII" also apply "to claims of discrimination in employment in violation of . . . the Equal Protection Clause."  Patterson v. County of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004).

For the same reasons the court explained in its discussion of Title VII, the court concludes that Armstrong has presented evidence sufficient to support a reasonable jury finding that the defendants discriminated against her on the basis of her race in refusing to hire and then deciding to fire her. See Sorlucco v. New York City Police Dep't, 888 F.2d 4 (2d Cir. 1989)(using the same standards to analyze Title VII and section 1983 claims of discriminatory and retaliatory discharge).

### C.  Color of State Law

In addition to presenting evidence that the defendants deprived Armstrong of a constitutional right, Armstrong must also present evidence that they did so "under color of state law." "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 230 (2d Cir. 2004). The parties do not dispute that the defendants, as state employees, plainly acted under color of state law when they refused to hire Armstrong as a CCT and then fired her. Armstrong, therefore, has satisfied section 1983's second requirement.

Because Armstrong has raised genuine issues of material fact as to both parts of the section 1983 prima facie case, the motion is denied in this respect.

IV.  **Section 1983 Claims Against Individual Defendants in their Individual Capacities**

### A. Qualified Immunity

The individual defendants, Flattery, Scherer, Farieri, and Jones next argue that they are "entitled to the protection of qualified immunity."  Specifically, they argue that their "conduct was objectively reasonable under the circumstances" and that Armstrong has offered "no credible evidence to suggest that under the circumstances . . . their decision to terminate plaintiff would violate clearly established law."

In response, Armstrong argues that the individual defendants are not entitled to qualified immunity.  First, Armstrong argues that it was clear that "hiring someone at a lower level classification and with a lower salary than they are entitled to because of their race was unlawful" and that "terminating someone's employment because they complained of race discrimination was unlawful."  Second, "it was not objectively reasonable for the individual defendants to believe that their actions did not violate clearly established law."

When a plaintiff sues government officials in their individual capacity, the doctrine of qualified immunity protects them from civil liability for money damages "if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." Bizarro v. Miranda, 2005 WL 31015, at *3 (2d Cir. Jan. 7, 2005).

26

Armstrong's right to be "free from discrimination because of her race was well-established" at the time the events at issue allegedly occurred. <u>Grey v. City of Norwalk Bd. of Educ.</u>, 304 F. Supp. 2d 314, 331 (D. Conn. 2004) (citing <u>Hazelwood Sch. Dist. v. United States</u>, 433 U.S. 299, 316 n.3(1977) (restating that the Fourteenth Amendment forbids racial discrimination)). Furthermore, a reasonable DSS official "especially in light of the long-established and well-known law on the subject," would not have "thought that it was acceptable to treat [Armstrong] differently because of her race" in either her hiring or firing her. <u>Id.</u>

Construing the record in the light most favorable to Armstrong, the individual defendants are not entitled to qualified immunity.  The issue of whether the individual defendants treated Armstrong differently because of her race is an issue of fact for the jury to decide.

**IV.  CFEPA**

The plaintiff "concedes that judgment should be entered in favor of the Defendant DDS . . . under the Connecticut Fair Employment Practices Act."  Accordingly, the defendants' motion is granted in this respect.

**CONCLUSION**

For the foregoing reasons, the defendants' motion for summary judgment (document no.29-A) is DENIED in part and GRANTED in part.  The motion is denied as to the Title VII and 42 U.S.C. § 1983 claims.  The motion is granted as to the CFEPA claims.

It is so ordered this 26TH day of January, 2005 at Hartford, Connecticut.

_____
Alfred V. Covello
United States District Judge

28